BALDWIN v. REYNOLDS et al.

(Circuit Court of Appeals, Sixth Circuit. July 13, 1911.)

No. 2,122.

1. BILLS AND NOTES (§ 310*)—CONTRACT FOR SALE OF NOTES—CONSTRUCTION AND VALIDITY.

Complainant became the owner through the death of her husband of certain notes for $19,000, secured by a purchase-money lien on timber land. After her husband's death his brother, who was a lawyer, acted as complainant's agent and managed her affairs as he thought for her best interest. The maker of the notes having become insolvent and the sufficiency of the security being doubtful, he made a written proposal to the maker, which the latter accepted on behalf of a lumber company of which he was president, to sell the notes at a discount of $6,000, part cash and part in payments, complainant to retain the notes and lien as security. Under such contract the lumber company made payments from time to time until but about $4,000 of the agreed price for the notes remained unpaid, several of such payments being made after the time fixed for completing payment had expired. Complainant knew of the contract, that it was made with the maker of the notes, and provided that he might transfer his rights thereunder, and was also chargeable with knowledge that the payments were made by the corporation. *Held*, that it was an executed contract for the sale of the notes under which the title to the same passed at once to the purchaser; that as it contained no provision making it void on default in the payments complainant was estopped by accepting and retaining payments made afterward from insisting that it was executory, that time was of its essence and title to the notes did not pass, and that the payments should merely be applied thereon.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 742, 743; Dec. Dig. § 310.*]

2. PRINCIPAL AND AGENT (§ 171*)—CONTRACT MADE BY AGENT—ESTOPPEL OF PRINCIPAL TO DENY AUTHORITY.

Complainant's brother-in-law having died she appointed as her agent another lawyer who was somewhat familiar with her affairs, and several of the payments by the lumber company were made to him both before and after the company was in default. Later a further payment was made and a contract entered into between the agent and a representative of the company providing that complainant should bring a suit to foreclose the lien for the entire $19,000, making certain other lien claimants parties to cut off their rights, and should bid for the property the full amount of the judgment obtained, and if she acquired the land should convey it to the company on its payment to her of the amount remaining due on the contract, while if it was purchased by others she should first receive such amount, the company should be paid the amount of its last payments, and the remaining purchase money should be divided between them. The suit was brought, but complainant subsequently denied the authority of her agent to make such agreement, and the right of the company to such share of the recovery. *Held* that, by the course of dealing between her and the agent, he had at least apparent authority to make the contract, and that in any event having received and retained the payments made by the company at the time she was estopped to deny his authority and was entitled in equity to no more of the recovery than the amount due her under the contract for the sale of the notes, with interest.

[Ed. Note.—For other cases, see Principal and Agent, Dec. Dig. § 171.*]

Appeal from the Circuit Court of the United States for the Eastern District of Kentucky.

Suit in equity by Isabella C. Baldwin against Mary A. Reynolds and others. Complainant appeals. Affirmed.

A large tract of timber land in Rowan county, Ky., was sold by William H. Baldwin, his wife, Isabella, joining in the deed, on June 26, 1895, to Thomas J. Reynolds for $30,000, $5,000 of which was paid in cash and the balance was evidenced by eight promissory notes as follows:

| No. | Date of Maturity. | Amount. |
|---|---|---|
| 1. | On or before January 1, 1897 | $ 3,000.00 |
| 2. | On or before January 1, 1898 | 3,000.00 |
| 3. | On or before January 1, 1899 | 3,000.00 |
| 4. | On or before January 1, 1900 | 3,000.00 |
| 5. | On or before January 1, 1901 | 3,000.00 |
| 6. | On or before January 1, 1902 | 3,000.00 |
| 7. | On or before January 1, 1903 | 3,000.00 |
| 8. | On or before January 1, 1904 | 4,000.00 |
| | | $25,000.00 |

All of the notes were dated July 1, 1895, with interest at 6 per cent. payable January 1st, and July 1st, of each year, to the order of William H. Baldwin at the Commercial Bank of Rochester, N. Y.

In the deed a lien was expressly retained upon all the property conveyed, "as surety for the unpaid purchase money therefor," the notes being described in detail.

The deed contained the following reservation: "The parties of the first part, however, except and reserve for themselves, their heirs and assigns, all gas, oil and minerals found in or on the lands hereby conveyed, with the right to go upon said lands to develop the same at any time." Also a provision that: "The grantee, his heirs, or assigns may at any time prior to January, 1896, pay off the whole of said lien so reserved and represented by said notes, or any portion thereof, and, if he shall so elect, he shall receive a discount on the amount of said debt so paid at the time such payment is so made."

On the same day Baldwin and his wife entered into an agreement with one Rodbourn covering the mineral rights so reserved. The agreement recites the sale to Reynolds and the retention of the mineral rights and also the lien to secure the $25,000 balance of purchase money, the notes evidencing the balance being set out in the agreement at length. The agreement further provides: "Now, therefore, the said party of the first part [the Baldwins] in consideration of one dollar to each of them paid and other valuable consideration, the receipt whereof is hereby acknowledged, do hereby agree to deed or lease unto the said party of the second part, his heirs or assigns, or to whomsoever he or they may direct, the said oil, gas and mineral as reserved in said deed to Thomas J. Reynolds, aforesaid, with the right to develop the same upon the payment of twenty-five thousand dollars with interest, as in aforesaid lien reserved as part purchase money of said lands, and in said parties of the first part on receiving payment of such liens of twenty-five thousand dollars and interest above mentioned, shall at their own proper cost and expense execute and deliver to the said party of the second part, or to whomsoever he may direct, a good and sufficient deed or release of said oil, gas and mineral rights, as reserved in said deed to Thomas J. Reynolds."

Baldwin was a lawyer in Cincinnati, having an office with his brother, J. F. Baldwin, also a lawyer. Baldwin died June 8, 1898, at which time the first two of the Reynolds notes due January 1, 1897, and January 1, 1898, had been paid. A few days after his death his will was probated in Hamilton county, and his wife, Isabella C. Baldwin, the appellant, qualified as executrix, she being the sole devisee and legatee under his will.

J. F. Baldwin, after his brother's death, had complete charge of the

widow's business affairs and acted for her until his own death in December, 1899. She had full confidence in him.

The semiannual interest due July 1, 1898, is admitted to have been paid, and on January 1, 1899, there remaind unpaid of the purchase money $19,000 and six months' interest. The third note and such interest, amounting to $570, were due January 1, 1899.

Reynolds was in the lumber business, and lumbered this land or a part of it. It is probable that he paid the first two notes out of the proceeds of lumber taken from the land. Reynolds had been concerned with the Hixon Rodbourn Lumber Company which became bankrupt, and in April, 1897, Reynolds then himself insolvent, organized the Standard Lumber Company, appellee, between which and Mrs. Baldwin the present controversy exists.

The assets of the Hixon-Rodbourn Company were turned over to the Standard Lumber Company. The capital stock of the new company was $10,000 divided into 100 shares of $100 each. Reynolds subscribed for 94 shares, E. A. Marsh, his attorney, of Rochester, N. Y., for 3 shares, the consideration of which was legal services connected with the organization of the company, and John De Witt, the manager of the company, subscribed for 3 shares, the consideration of which does not appear. The company did considerable business in lumber, a part, at least, of which came from this tract of land. It discontinued business in 1903 or 1904, the exact time not appearing. There was apparently no meeting of its board of directors from the time of its incorporation until shortly after the death of Reynolds, October, 1902, at which time a meeting was held, Mary A. Reynolds, appellee, appearing and voting as the owner of 94 shares of the stock, and Marsh as the owner of 3 shares, and Reynolds' son as the owner of the 3 De Witt shares. How Mrs. Reynolds and her son obtained title to these shares does not appear, nor does it appear that any administration was had upon the estate of Reynolds. At that meeting the affairs of the company were put in charge of E. A. Marsh. On the death of J. F. Baldwin the management of Mrs. Baldwin's affairs were intrusted to Edward A. Hafner, who had been for many years a young lawyer in the office of the Baldwins, and undoubtedly had their confidence. He managed her affairs in the same manner as her brother-in-law J. F. Baldwin had managed them, and there was no reason to suppose that she had less confidence in him than she had had in her brother-in-law. She intrusted her business to each of them successively, to do with it as they thought best. Before Mrs. Baldwin's affairs came into Hafner's hands, he was familiar with much of the details of them. Her business affairs involved other matters besides the sale of this land, but they were not many, and this transaction involved apparently the most important item. Mrs. Baldwin lived in Cincinnati until about a year after her brother-in-law's death and while her affairs were in Hafner's charge for about a year, during which time she occasionally came to his office. She then moved to New York and remained there until 1906, when she took her affairs out of Hafner's hands and put them in charge of Charles H. Stephens of Cincinnati, her present counsel.

When Hafner was discharged he turned over to Mr. Stephens all of Mrs. Baldwin's papers, including a copy of the contract of June 22, 1899, to which reference will be made.

The first two Reynolds notes were found by Marsh among the papers of the Standard Lumber Company. They were indorsed by William H. Baldwin without recourse. The other notes disappeared. Hafner was unable to find them, nor could Marsh find among Reynolds' and the Standard Lumber Company's papers the third note, which, under the facts, might be expected to be among the papers of the Standard Lumber Company.

There is a suggestion in the evidence that all of the notes had at some time been turned over to some bank by William H. Baldwin as collateral security or for collection. It is probable, though no direct finding of fact can be made on the subject, that all of the notes were indorsed by William H. Baldwin in his lifetime, though none of them were indorsed by his executrix sua manu, and it is not shown that J. F. Baldwin indorsed them, but Hafner did not.

Reynolds was undoubtedly the moving and managing force as well as the almost exclusive owner of the Standard Lumber Company, though it was a separate, distinct identity from him and carried on business after his death, a part of which, at least, was lumbering this tract. When the lumber company ceased business in 1903 or 1904, its debts were at least as large as its assets. Reynolds, a few days before his death, October, 1902, conveyed the real estate to his wife, Mary E. Reynolds, by deed. On January 1, 1899, there remained unpaid $19,000 and six months' interest. The third note of $3,000 and the entire interest amounting to $570 were due January 1, 1899. On January 5, 1899, the following receipt found by Mr. Marsh was given the Standard Lumber Company:

"Cincinnati, January 5, 1899.

"Received from the Standard Lumber Company, of Rodbourn, Kentucky, three thousand and five hundred and seventy dollars, on account of purchase of notes, made by T. J. Reynolds. Esq., to the order of W. H. Baldwin amounting in the aggregate with interest January 1, 1899, to $19,570.00, and if said company should fail to complete the purchase of said notes by July 1, 1899, the undersigned hereby agrees to deliver one of said notes due January 1, 1899, for $3,000.00 as paid in full so far as the remaining notes are concerned. Also she agrees to indorse $480.00 of the above sum, as paying all interest on the residue of said notes up to January 1, 1899, and leaving the balance due on said purchase $11,000.00 and interest from January 1, 1899.

"Isabella C. Baldwin, Ext.,

"By J. F. Baldwin."

The receipt is evidence that on that day the Standard Lumber Company paid Mrs. Baldwin for the third Reynolds note and the interest on all the notes to January 1, 1899, and it was agreed that, even if the purchase were not completed, yet that note was paid as to Mrs. Baldwin, and was to be kept alive as against Reynolds in the interest of the Standard Lumber Company. By this agreement the Standard Lumber Company would hold the third note against Reynolds and would buy the balance, $16,000, for $11,000, with interest from January 1, 1899, and as against Reynolds would have all the rights Mrs. Baldwin had to recover the entire $19,000, making a saving of $5,000. The company made no further payment, and this agreement was permitted to lapse or was abandoned, but under it the company became entitled to the third note for $3,000 for which it had paid. However, before July 1, 1899, the following agreement was entered into:

"Whereas, there is now due from T. J. Reynolds, Esq., for one-half year's interest up-to July 1, 1899, on purchase money for property sold to said Reynolds by the late General W. H. Baldwin, of Cincinnati, Ohio, the sum of $330.00.

"And will become due January 1, 1900, the sum of $3,000.00.

"And will become due January 1, 1901, the sum of $3,000.00.

"And will become due January 1, 1902, the sum of $3,000.00.

"And will become due January 1, 1903, the sum of $3,000.00.

"And will become due January 1, 1904, the sum of $4,000.00.

"And interest on all of said sums, payable semiannually from and after July 1, 1899.

"And whereas Isabella C. Baldwin, widow and executrix of said General W. H. Baldwin and sole owner of all of said sums of purchase money and of the purchase money lien reserved in the deed conveying said lands to said Reynolds, desires to settle said entire transaction and to collect as soon as possible all moneys coming to the estate of said W. H. Baldwin.

"Now, therefore, for the purpose aforesaid, said Isabella C. Baldwin hereby proposes to sell and convey to such person or persons or corporations. as said Reynolds shall name all of said purchase-money notes, and purchase money, and the lien reserved in said deed to secure the payment of said notes for the sum of $10,330.00, payable as follows:

"$3,130.00 payable in cash.

"$3,130.00 payable January 1, 1900, with 6 per cent. interest, from July 1, 1899, and $4,100.00, payable July 1, 1900.

"The above-mentioned notes and purchase-money liens to secure the same to be retained by said Isabella C. Baldwin until said last three named payments shall be made.                                      Isabella C. Baldwin,

"By J. F. Baldwin, Her Attorney.

"Dated June 22, 1899. In duplicate.

"I hereby accept the above proposition. Dated, June 22, 1899.

"T. J. Reynolds."

And on that day the following receipt was issued by J. F. Baldwin:

"Cincinnati, June 22, 1899.

"Received from T. J. Reynolds, Esq., check of the Standard Lumber Co., by T. J. Reynolds, No. 2,198, for the sum of $3,130.00 which when paid is in full of the first payment on the within written contract, $3,130.00.

"Isabella C. Baldwin,

"By J. F. Baldwin, Her Attorney."

Mrs. Baldwin was in Cincinnati at the time this agreement was made and afterwards knew of it, made no objection to it, and does not dispute the propriety of J. F. Baldwin making the contract in her behalf, and has accepted all payments made on account of the same, whether to J. F. Baldwin or to Hafner.

This cash payment of $3,130 was the only money paid during J. F. Baldwin's lifetime. The receipt of the $3,130 is indorsed on the contract in the handwriting of J. F. Baldwin as follows:

"Cincinnati, June 22, 1899.

"Received from T. J. Reynolds, Esq., check of the Standard Lumber Co., by T. J. Reynolds, No. 2,189, for the sum of $3,130.00 which when paid, is in full of the first payment on the within written contract.

"Isabella C. Baldwin,

"By J. F. Baldwin, Her Attorney.

"Check drawn on the First National Bank of Huntington, W. Va.

"J. F. Baldwin."

Shortly after Hafner took charge there was paid to him on the agreement $693 by check of the Standard Lumber Company as follows:

"Standard Lumber Co., Wholesale Lumber.

"Huntington, W. Va., Feb. 19, 1900.

"No. 2946. Pay to the order of E. A. Hafner, atty. for Isabella C. Baldwin $693.00 six hundred and ninety-three dollars.

"To First National Bank, Huntington, W. Va.

"Standard Lumber Co.

"By T. J. Reynolds, Pt."

And on the contract is the following indorsement:

"Cincinnati, Jan. 1, 1900.

"Received of T. J. Reynolds check of the Standard Lumber Co. by T. J. Reynolds for the sum of $693.00, which when paid is to be credited on the within contract on acct. of the amount due Jan. 1, 1900.

"Isabella C. Baldwin,

"Per E. A. Hafner, Her Atty."

This receipt so indorsed is, without doubt, a memorandum of the payment by the check of February 19, 1900.

The next payment is evidenced by the following receipt in Hafner's handwriting:

"Cincinnati, O., July 24th, 1900.

"Received from Standard Lumber Co., of Huntington, W. Va., one thousand and eighty-five 45-100 dollars to apply on contract for sale of T. J. Reynolds notes to W. H. Baldwin.                           Isabella C. Baldwin,

"Per Edw. A. Hafner, Atty."

These payments were made when Mrs. Baldwin was living in Cincinnati and making occasional visits to Hafner's office.

The next payment, March 23, 1901, is by check of the Standard Lumber

Company to Hafner, attorney, for $693, and payment indorsed by him on the copy of the agreement.

The contract of June 22, 1899, was in duplicate, each party taking one. Mrs. Baldwin's copy was in Mr. Hafner's hands and was lost, probably with the notes, but in 1906 he turned a copy, with the indorsements on it, over to her counsel, Mr. Stephens. It does not appear that she actually knew of the nature of the indorsements upon the copy, or that there were any indorsements until that time. The $693 paid February 19, 1900, paid $93 interest to January 1, 1900, on the note for $3,100 due that day, and $600 on the principal reducing that note to $2,500 with interest from January 1, 1900.

The next payment was by check as follows:

"Standard Lumber Co., Wholesale Lumber.

"Huntington, W. Va., March 22, 1901.

"No. 4455. Pay to the order of Edward A. Hafner, atty. $693.00 six hundred and ninety-three dollars, for

"To First National Bank, Huntington, W. Va.

"Standard Lumber Co.,
"By T. J. Reynolds, Pt."

There is no indorsement of this sum on the original agreement, but on the copy turned over by Hafner to Stephens there is an indorsement March 22, 1901, paid on within $693. Why this exact sum of $693 was paid at that time does not appear, for analysis does not disclose any particular application to interest or principal.

The $1,085.45 paid the interest on the note due January 1, 1900, theretofore reduced to $2,500 from January 1, 1900, to July 24, 1900, and $1,000 on the principal which was thus reduced to $1,500 with 6 per cent. running from July 24, 1900.

The next payment was as follows:

"Standard Lumber Co., Wholesale Lumber.

"Huntington, W. Va., March 30th, 1903.

"No. 7236. Pay to the order of Edward A. Hafner, Atty. $1,164.00, eleven hundred and sixty-four dollars. For: Upon purchase Baldwin notes vs. Rowan lands.

"To First National Bank, Huntington, W. Va.

"Standard Lumber Co.
"By E. A. Marsh, V. Pt."

This is indorsed on the original agreement:

"Received of the Standard Lumber Company the sum of $1,164.00 by check to apply on within.

"March 30th, 1903.                                              Edw. A. Hafner."

When this payment was made, Reynolds had been dead all of five months. Hafner knew of Reynolds' insolvency and death. Whether Mrs. Baldwin actually knew these facts does not appear. At that time the Standard Lumber Company was probably carrying on business, and certainly was making payments on the contract of June 22d. Hafner knew the payments were made by it on the contract. The last payment to be made under the agreement was $4,100 payable July 1, 1900, so that the payments of July 24, 1900, March 22, 1901, of March 30, 1903, and of May 13, 1903, noted immediately below, were received by Hafner on account of this contract and turned over to Mrs. Baldwin by him after the time fixed for the last payment.

On May 13, 1903, Hafner received a check as follows:

"Standard Lumber Co., Wholesale Lumber.

"Huntington, W. Va., May 13th, 1903.

"No. 7342. Pay to the order of Ed. A. Hafner, Atty. for Isabella C. Baldwin $600.00, six hundred dollars. For: On account of purchase money lien on the Rodbourn Land.

"To First National Bank, Huntington, W. Va.

"Standard Lumber Co.
"By E. A. Marsh, V. Pt."

The foregoing check is indorsed as follows:

"Pay to Isabella C. Baldwin or order

"Ed. A. Hafner, Atty. for Isabella C. Baldwin.

"Isabella C. Baldwin."

The Rodbourn land is another name for the timber land in question, so Mrs. Baldwin knew that at least $600 of the moneys that were paid on that contract were paid by the check of the Standard Lumber Company without the intervention of T. J. Reynolds in any capacity. It is highly probable that she actually knew of Reynolds' insolvency and death. The payment of the $600 is not indorsed on the original nor on the copy. The sum of these various payments, including the amount paid on the contract of January 5, 1899, was $10,935.45, and they were paid by the moneys of the Standard Lumber Company.

Judge Cochran in his closely reasoned and painstaking opinion showed that the amount due Mrs. Baldwin under the contract on May 13, 1903, was $4,315.03, the correctness of which, as a calculation, is admitted by appellant, who concedes that if that contract is binding on Mrs. Baldwin that amount and interest is the sum to which she is entitled.

On or about March 30, 1903, Marsh, knowing that Hafner had charge of Mrs. Baldwin's affairs, came to Cincinnati, had a conference with him, figured on the amount due Mrs. Baldwin on the contract of June 22, 1899, which was fixed at $5,000. This was a mistake, as the calculation of figures shows. It should have been $4,315.03 as the parties undoubtedly figured the $693 paid February 19, 1900, as a different payment from that evidenced on the copy of the contract of the same amount as of January 1, 1900. March 30, 1903, Marsh paid Hafner $1,164 by check on that day, and came to Cincinnati again on or about May 13th, at about the time the check for $600 was sent, and at that time the following agreement was entered into between Marsh and Hafner:

"Whereas on or about the 26th day of June, 1895, W. H. Baldwin of Cincinnati, Ohio, deceased, sold to Thomas J. Reynolds, late of Huntington, W. Va., deceased, a tract of land situated in Rowan county, Kentucky, reserving in the deed to said Thomas J. Reynolds rights to all the oil, gas and mineral located on said land and the right to develop the same, and also reserving in said deed a lien on said lands securing the deferred payments of purchase money.

"And whereas, on or about the same day the said W. H. Baldwin, deceased, and Isabella C. Baldwin, his wife, executed and delivered to one James H. Rodbourn, of Erin, Chemung county, New York, a certain contract in which he agrees to deed or lease unto the said James H. Rodbourn, or as he may direct, all of the gas, oil and mineral found in or on said lands with the right to develop same, provided all of said deferred payments of purchase money should be paid to the said W. H. Baldwin by said Thomas J. Reynolds, and

"Whereas the Standard Lumber Co., a corporation, organized under the laws of the state of Kentucky, have advanced certain moneys, to wit, the sum of $10,242.45 toward the purchase of said purchase-money lien on said lands, and

"Whereas, the said Thomas J. Reynolds has failed to pay said purchase money, and there is still due and owing on said purchase money lien to Isabella C. Baldwin, the widow and sole heir and devisee of said W. H. Baldwin, and to the said Standard Lumber Company the sum of $————, and

"Whereas it is considered and agreed by and between the parties hereto that the said contract made by the said W. H. Baldwin to said James H. Rodbourn is of no force and effect as against the rights of the said Standard Lumber Company and Isabella C. Baldwin.

"Now, therefore, in consideration of the mutual covenants herein contained it is hereby mutually agreed that the said Isabella C. Baldwin shall bring a suit in foreclosure and foreclose the lien of the parties hereto for the unpaid portion of said purchase money of said lands, including all notes heretofore purchased by said Standard Lumber Company, which notes held by both parties amount, in the aggregate, to $19,000.00, and interest from January 1, 1899,

and the said Standard Lumber Company in consideration of the agreements herein contained hereby assigns, transfers and sets over to said Isabella C. Baldwin all of said notes and indebtedness heretofore purchased by it. It is further agreed that the said James H. Rodbourn and his assigns shall be made a party to the suit of foreclosure and proper allegations made to cut off and determine the rights of said James H. Rodbourn and his assigns under and by virtue of the contract made between him and the said W. H. Baldwin and Isabella C. Baldwin.

"It is further agreed that the costs necessary to maintaining said action shall be shared equally by the Standard Lumber Company and said Isabella C. Baldwin: and it is agreed that in the event of Isabella C. Baldwin recovering a judgment against the parties to said suit and procuring an order of sale of said property free and clear of any rights or equities which the heirs or assigns of said Thomas J. Reynolds or the said James H. Rodbourn or his assigns may have or claim, then and in that event said Isabella C. Baldwin shall bid on said lands up to the full amount of the judgment obtained in said suit, and if the same is sold to her she shall convey to the said Standard Lumber Company or their successors or assigns all of the said lands sold to her at such sale, reserving to herself only the undivided one-half of all the oil, gas and mineral rights, covering iron, coal, fire clay and whatsoever other mineral and mineral clay may be found in or on said lands with the right to develop the same, and the right to ingress and egress over said lands, upon the payment to her of the sum of $5,000.00, and interest from April 1, 1903, which said sum the Standard Lumber Company hereby agrees to pay. In case of the purchase of said lands by any person other than the parties to this contract at said foreclosure sale, it is hereby agreed that $5,000.00 of the amount so collected and interest from April 1, 1903, shall be paid to the said Isabella C. Baldwin, and the balance thereof shall be divided between the said Isabella C. Baldwin and the Standard Lumber Company after repaying to the Standard Lumber Company the sum of $1,764.00, paid by it at the time of making this contract, provided, however, that should the said Isabella C. Baldwin in said suit not succeed in recovering judgment for at least $19,000.00, or should not succeed in recovering the judgment cutting off the rights of the said James H. Rodbourn and his assigns, then the said Standard Lumber Company shall be entitled to an assignment of all the rights; title and interest of the said Isabella C. Baldwin in said notes and lien on payment to her of the said sum of $5,000.00 and interest from April 1, 1903, and costs of said foreclosure action.

"Witnesses the hands and seals of the parties this day of May, 1903.
"Standard Lumber Co.
"By E. A. Marsh, V. Pt.
"Isabella C. Baldwin,
"By Edw. A. Hafner, Atty."

The particular significance of the reference to the contract with Rodbourn for the gas, oil, and minerals in the tract of land lies in the fact that the contract was on record, and was a cloud on the mineral rights, and on the title of the land. Hafner wanted to get rid of those claiming under Rodbourn, as the mineral rights might be of some value. Mrs. Baldwin was pressing Hafner for money. He told Marsh he must have some money, and that he thought he ought to foreclose Mrs. Baldwin's lien. The question was debated whether the contract of June 22, 1899, was still in force; the payments not having been made on time. Marsh called attention to the payments actually made long after the date the last payment was to be made under the contract, and showed Hafner that the Standard Lumber Company had substantial rights which should be protected, growing out of the payment of the money. The agreement was the result of their conference. Hafner at that time evidently did not doubt his power to make the agreement with Marsh.

By mesne conveyances one Gillmor became the owner of such rights as Rodbourn had under his agreement with Baldwin. In pursuance of the agreement, a bill was filed in the Rowan, Ky., circuit court, entitled Isabella C. Baldwin, Widow and Heir at Law of William H. Baldwin, Deceased, Plaintiff, vs. Mary A. Reynolds, J. H. Rodbourn, Grace Rodbourn, Edwin Ripley, Ada C. Ripley,

George Gillmor, and Christian Glatzau, Defendants, in which the plaintiff claiming there was still $19,000.00 with interest from January 1, 1899, unpaid on the Reynolds' purchase-money notes, prayed for a judgment against Mary A. Reynolds for that sum and interest, and, in default of payment, for an enforcement of the lien reserved in the deed to Reynolds and a sale of the premises to pay the amount due.

On October 2, 1900, Reynolds, being indebted to Buell in the sum of $6,000, executed, his wife joining therein, a mortgage to Buell to secure that sum. October 27, 1903, the cause upon petition of Rodbourn and his wife, Ripley and his wife, Gillmor and Blatzau, was removed to the Circuit Court of the United States for the Eastern District of Kentucky.

Mrs. Reynolds answered, denying any sum of money was due from her to the plaintiff, and prayed that so much of the plaintiff's petition as sought a personal judgment against her be dismissed. On November 14, 1904, the parties at whose instance the cause was removed demurred to the bill for that it showed no cause of action against them, which demurrer was sustained November 17, 1904. The cause then stood between Mrs. Baldwin as complainant and Mrs. Reynolds as respondent.

On April 24, 1906, Gillmor filed a cross-bill by leave of court. He showed the deed to Reynolds, the deed by Reynolds to his wife, the reservation to Baldwin, his heirs and assigns of all gas, oil, and mineral rights, and the agreement of Baldwin and his wife with Rodbourn. He also showed the mesne conveyances through which he became the assignee of Rodbourn's contract and rights. He claimed that the $19,000 balance of purchase money had been paid to Baldwin, that there was no lien upon the premises, and that Mrs. Baldwin and Mrs. Reynolds were conspiring to the end that they might assert large and unjust claims upon the property, and thus defeat his rights. He prayed for an accounting between Mrs. Baldwin and Mrs. Reynolds and for a deed from Mrs. Baldwin to him, and that, if any balance of purchase money were found still due Mrs. Baldwin, the property be sold to pay the same, and that a deed of the oil, gas, and minerals be made to him.

On April 24, 1906, complainant took an order to file an amendment to her bill or a supplemental bill, setting up the amount paid by her since the suit was brought for taxes, penalties, and interest assessed upon the mineral, oil, and gas rights in the land. Neither of these pleadings were filed, nor did she ever amend her bill in any particular. On the same day the cause was referred to J. C. Finnell as special master to ascertain and report the amount due complainant on the lien reserved in the deed, and on May 10, 1906, Mrs. Baldwin and Mrs Reynolds were made parties respondent to Gillmor's cross-bill.

On June 4, 1906, Mrs. Reynolds answered the cross-bill, denying Gillmor's claim of interest in the premises, and denying the charge of conspiracy with Mrs. Baldwin, denied in substance all of the allegations in the cross-bill, and prayed to be dismissed.

July 2, 1906, Mrs. Baldwin filed a plea to the cross-bill of Gillmor. In the meantime, January 17, 1907, Buell filed an intervening petition setting up his mortgage. July 18, 1907, Mrs. Baldwin's plea was overruled. Various proceedings were taken, not necessary for consideration here.

December 16, 1907, Mrs. Baldwin answered Gillmor's cross-bill. She denied its allegations and that Gillmor has any interest in the mineral rights until the $25,000 balance of purchase money from Reynolds was paid, and averred "that it is true that in her original bill filed herein she alleged that there was yet unpaid on the purchase price of the lands, sold as aforesaid to Reynolds and secured by a lien on said lands, the sum of $19,000, with interest from the 1st day of January, 1899; that at that time this defendant was informed by her attorneys that said sum was due her and she believed such to be the fact; that she has since learned the fact to be that $6,000 was paid on account of the purchase price of said lands and in discharge of said lien by Thomas J. Reynolds; that subsequent to that time further payments were made by the Standard Lumber Company, a corporation; that said corporation claims that the payments made by it were a part of the purchase of her lien on said lands, and not a payment in discharge of said lien; that giving credit

for the total amount received by this defendant from all sources on account of said lands sold to Reynolds there remained due to this defendant on the 1st day of January, 1907, approximately the sum of $13,000; that, in addition to said sum still due on the purchase price of the said lands, the plaintiff has been obliged to pay large amounts for taxes both upon the surface rights and mineral rights in said lands, and penalties for delinquent taxes, amounting to more than $2,500, and has incurred large expenditures in attempting to realize upon her security."

And she prayed that the equities of the case as presented upon the cross-bill and her answer be found to be with her. On the same day she answered the intervening petition of Buell, and avers that, if he has any lien, it is inferior to her purchase-money lien. In this answer she averred her want of knowledge as to the relation of the Standard Lumber Company to Reynolds as to whether or not payments made by the Standard Lumber Company were in part payment and discharge of the purchase-money lien, or were part of the purchase of the same as claimed by the Standard Lumber Company.

December 24, 1908, Finnell, special master, filed his report. He found the various payments made by Reynolds and the Lumber Company and made findings based upon two views—one, that the contract of June 22, 1899, was binding on Mrs. Baldwin and that her claim to the purchase-money notes, and interest must be based on it; and the other, upon the theory of her counsel that the contract was void, and that she was entitled to recover as if the contract had not been entered into. He found the amount due her on that theory as calculated by an expert bookkeeper to be July 1, 1908, $15,306.91. This amount was reached by applying the payments first to the payment of interest due upon all the notes, and then to the notes in order of priority.

Marsh, upon learning of this report, filed by leave, March 31, 1909, the intervening petition of the Standard Lumber Company which alleges that prior to the 1st of January, 1903, the petitioner paid the complainant in part purchase of the purchase-money lien set forth in her original complaint, $10,242.45, upon the agreement between her and the petitioner that the same was paid upon the purchase of the purchase-money lien in which the petitioner had thereby acquired an interest in that amount. The intervening petition also averred that the petitioner, the Standard Lumber Company, on or about March 22, 1903, paid the complainant $1,164 and again on May 13, 1903, paid the complainant the sum of $600 upon the agreement that said sum should apply upon the purchase of the complainant's purchase-money lien, and that said sums were received by her upon that understanding, and thereby the petitioner acquired further interest in the purchase-money lien in the sum of $1,764 and interest from the dates of the respective payments amounting in all to an interest in the lien to the extent of $12,006.45 and interest from the dates of respective payments. The petition averred the priority of this sum to any interest the other defendants might have, and averred that said sum and interest were part of the $19,000 and interest claimed by the complainant, Mrs. Baldwin, in her petition, which prior to the commencement of her suit she had agreed with the petitioner to account for out of the proceeds of the sale, and averred that Mrs. Baldwin made proof of the amount due her without reference to the interest of the Standard Lumber Company in the purchase-money lien. The petition also tendered an issue on the claim of Gillmor that Reynolds through the Standard Lumber Company paid off the purchase money due Mrs. Baldwin, and that the Standard Lumber Company ceased to do business at the death of Reynolds, or that the estate of Reynolds became the beneficiary of the assets of the corporation, but averred that no part of the money paid to Mrs. Baldwin was paid by Reynolds through the Standard Lumber Company, and that the estate of Reynolds had no interest in the corporation, and prayed that the amount adjudged to be due upon the purchase-money lien set forth in complainant's bill be decreed to include the amount paid by petitioner and interest in addition to the sum due Mrs. Baldwin in her own right, and that the amount paid by the petitioner be paid out of the proceeds of the sale of the land.

Gillmor answered, denying the averments in the intervening petition of the Standard Lumber Company, and asks that the intervening petition be dis-

missed. April 22, 1909, Buell answered the intervening petition, put in issue its averments, and asked that it be dismissed. September 27, 1909, Mrs. Baldwin answered the intervening petition of the Standard Lumber Company. She admitted the payment to her prior to January 1, 1903, of $10,242.45, alleges that she does not know whether it was paid by the Standard Lumber Company or by Reynolds. She denies any agreement between herself and the Standard Lumber Company, and that the amounts so paid were upon the purchase of the Reynolds notes and the purchase-money lien; denies that the Standard Lumber Company acquired a proportionate interest with her in the purchase-money lien to the amount of $10,242.45. She avers "that her affairs after the death of her husband, and during said period" (when the various amounts were paid), "were managed first by her brother-in-law, J. F. Baldwin, and later by Edward A. Hafner, her attorney, and that she never personally made any such agreement as alleged or had any knowledge thereof." She further admits the receipt of the $1,164 and the $600, and denies any agreement was made upon the receipt thereof. She denies ever having made any such agreement, or that she authorized her attorney to make the same, and says she does not know whether the payments should be considered as having been made in part payment of the notes and lien which she held, or in part purchase of the notes and lien of the Standard Lumber Company, and denies that that company had any right to further pro rata with her the amount due on the Reynolds notes. She admits that the sums alleged to have been paid by the Standard Lumber Company are a part of the $19,000 alleged in her original complaint to be due her, but denies that she agreed to account for it out of the proceeds of her suit thereafter, and alleges that, if any such agreement was made on her behalf, it was without her authority or knowledge, and that she never consented to the same. And thus the issues were made up.

Upon exhaustive consideration, the court below was of opinion that by the contract of January 5, 1899, the third note passed to the Standard Lumber Company, but subordinate in right of payment out of the land to the other purchase-money notes; that the contract of June 22, 1899, was an executed agreement; that the title of the Reynolds notes passed to the Standard Lumber Company upon its acceptance of the proposition of sale contained in the agreement; that Hafner had authority to act for Mrs. Baldwin in the agreement of May, 1903, though not to the extent of relinquishing her right to one-half or any part of the mineral rights in the land; that Buell's mortgage claim was valid, but subordinate to the payment of the purchase-money lien; that Gillmor had no interest until the entire $25,000 balance of purchase money was paid; that this might never happen, and therefore Gillmor had no present interest; that there was a lien on the land for the sum of $19,000 and interest, out of which the complainant was entitled to be first paid $4,315.03, with interest from May 13, 1903, the balance to go to the Standard Lumber Company.

The intervening petition of the Standard Lumber Company not setting up exactly its claim as the court found it should be, leave was granted to amend its petition to conform to the findings of the court, the amendment to be filed before the decree was entered. Thereupon such amended intervening petition was filed, alleging among other things that the first two notes for $3,000 each were paid by Reynolds; that Isabella C. Baldwin in consideration of $11,628.45 paid to her in cash at different times by the Standard Lumber Company, sold all of the notes, except the first two which had been paid by Reynolds, five of which were for $3,000 and one for $4,000 she reserving a lien on the same for a portion of the purchase money, estimated by mistake as $5,000 as of May 13, 1903, but which upon correct calculation turned out to be $4,315.03 of that date. The petition averred that the agreement of May 13, 1903, between Marsh and Hafner was for the purpose of enabling Mrs. Baldwin in her own name and for the benefit of the Standard Lumber Company and herself to enforce the lien for the entire amount due to herself and the Lumber Company, namely, $19,000 and interest from January 1, 1899, the proceeds of the sale of the lands to be applied first to the payment of the amount due the complainant, the $4,315.03 as of May 13, 1903, and the remainder of the $19,000 to be paid the Standard Lumber Company; that the suit

was brought by Mrs. Baldwin in her own name to carry out the terms of the agreement. Thereupon a decree was entered April 7, 1910, embodying the findings of the court theretofore made, and finding specifically, among other things, that Mrs. Baldwin and the Standard Lumber Company have a valid vendor's lien upon the land to secure the payment of $31,476.66, being $19,000 with interest from January 1, 1899, at the rate of 6 per cent. to December 11, 1909, and costs, of which sum $6,018.10 being $4,315.13 with interest from May 13, 1903, and December 11, 1909, was ordered to be first paid to Mrs. Baldwin and the remainder of the $31,476.66 and interest to be paid the Standard Lumber Company. The decree awarded a lien to Buell of $5,500, with interest amounting to $8,534.16, to December 11, 1909, to bear interest from that date, but subordinate to the purchase-money lien, and directed the sale of the property if the money was not paid within a certain time.

From this decree Mrs. Baldwin alone appeals. Her contention is that the amount found due her is $6,000 too small. This amount is the difference between the face value of the Reynolds notes and the figure at which Reynolds agreed to buy them under the contract of June 22, 1899.

Decree affirmed.

Charles H. Stephens and Charles H. Stephens, Jr., for appellant.

Frank Chinn and Ednor A. Marsh, for appellee Standard Lumber Co.

Before SEVERENS and KNAPPEN, Circuit Judges, and HOLLISTER, District Judge.

HOLLISTER, District Judge (after stating the facts as above). The case turns on the contract of June 22, 1899, between Mrs. Baldwin, by her attorney, J. F. Baldwin, and Thomas J. Reynolds, by which he or the person or corporation he might name agreed to pay for the last five of his notes aggregating $16,000 and $330 interest, the sum of $10,330, she retaining the notes as collateral security. Mrs. Baldwin denies its binding force on the ground that it is an executory agreement, the terms of which were not complied with by Reynolds, or any one for him or in his stead. She repudiates also the agreement of May 13, 1903, between Hafner and Marsh under which this suit to enforce the lien for $19,000 balance of the purchase money under the original agreement between W. H. Baldwin and Reynolds was brought by her in her name, but claimed by the Standard Lumber Company to be for its and her joint benefit; for the reason that Hafner had no authority to make it and by it extend the payment of the consideration of the agreement of June 22, 1899. She claims, therefore, that the amount decreed her by the court below was $6,000 and interest less than the amount she is entitled to.

The issues in the case here are based on these claims, and are between Mrs. Baldwin and the Standard Lumber Company alone, as she is the sole appellant.

[1] The contract of June 22, 1899, is not on its face executory. It is presumptive evidence of an actual sale, the title to the notes passing at once. 24 Am. & Eng. Enc. of Law, p. 1051, and cases cited. This presumption is not affected by the retention by the seller of the possession of the notes as security. Beardsley v. Beardsley, 138 U. S. 262, 11 Sup. Ct. 318, 34 L. Ed. 928; Morse v. Sherman, 106 Mass. 430.

The offer to sell was drawn by J. F. Baldwin, Mrs. Baldwin's attorney. It was afterwards read to her, and she had full knowledge of its terms. Being thus prepared, it should be most strongly construed against her. Robinson v. Alger (C. C. A. 2d Cir.) 167 Fed. 968, 970, 93 C. C. A. 368.

But the real test to be applied to the instrument in ascertaining its character is not furnished by its form or language except so far as they may reflect upon the intention of the parties, for whether or not an agreement for a sale is effective to pass title of the subject-matter is to be determined by the intention of the parties gathered from the instrument itself and all the circumstances of the case. As said by Judge Warrington, speaking for this court in Hoffman v. Gosslein, 172 Fed. 113, 96 C. C. A. 318:

"Nothing, perhaps, is better settled than that the intention of the parties must be given controlling effect in issues concerning the passing of title to personal property."

The document consists of an offer to sell to Reynolds or any one named by him the last five of the Reynolds notes and of an acceptance the same day by him in writing. In it Mrs. Baldwin expressed a desire to settle the entire land transaction, and collect as soon as possible all moneys coming to the estate of her deceased husband (she at that time was the owner of the notes as her husband's sole legatee), and it is recited that the offer was made with that purpose in view. Doubtless most agreements by which a creditor agrees to take less than his debt are based upon similar reasons, though the writing between the parties may be silent on the subject.

The whole transaction from the beginning shows a willingness on the part of W. H. Baldwin in his lifetime, and after his death by Mrs. Baldwin represented by J. F. Baldwin with full authority, to accept a smaller amount in payment of the debt. The agreement of January 5, 1899, by which the Standard Lumber Company was to have a discount of $5,000, provided in its very terms that, if the company should fail to complete the purchase by July 1, 1899, nevertheless the third Reynolds note for $3,000 due January 1, 1899, was to be considered as paid as between Mrs. Baldwin and the Lumber Company, though it should continue in full force as to Reynolds, and perhaps subordinate in right of payment to the other Reynolds notes of later date.

Why that agreement was abandoned does not appear, but nine days before the time fixed for the completion of the purchase of all the notes by the Standard Lumber Company the new agreement of June 22, 1899, was made. From that agreement the third note due July 1, 1899, was omitted as if no longer outstanding even as between Mrs. Baldwin and Reynolds, and the balance on the original notes was fixed at their face $16,000, with $330 interest due July 1, 1899. It is probable, as suggested by Judge Cochran, that, when it appeared that the Lumber Company was unable to complete the purchase, Reynolds, as the owner of almost all of its stock and its president, sought and obtained further time and better terms for his company, which were embodied in the contract of June 22d, since the purchase price was

thereby reduced by a further $1,000, making the entire reduction $6,-000, the amount in controversy between the parties here.

The final agreement of sale will be searched in vain for any indication that the parties intended that, if the deferred payments were not made at the times fixed, the agreement should be void. J. F. Baldwin drew the receipt of January 5th and the offer of sale of June 22d. In the preparation of the first he dealt with the possibility of failure on the part of the Lumber Company to complete the sale under its terms. In the second no mention is made in any way of a possible failure of Reynolds or the person whom he might name to perform what he agreed to perform. J. F. Baldwin was a lawyer known to the writer of this opinion as a careful, faithful practitioner at the Cincinnati bar. If he had contemplated the failure of a compliance by the purchaser with the terms of this sale and have intended that the payment of the consideration by the purchaser was a condition precedent to the passing of the title of the notes, or that the rights of the purchaser should be forfeited in the event of the failure to comply with the terms of the agreement, he would have incorporated such an intention in the paper itself. Indeed, any lawyer of ordinary experience would have done so. If the intention of the parties was as Mrs. Baldwin claims, then the $3,130 paid on the day the offer and the acceptance were made would have been lost to the Lumber Company as the real acceptor of Mrs. Baldwin's offer, unless the deferred payments were also made. The company at that time being the owner of the third note would scarcely have made such a large cash payment on any other understanding than that thereby and by its promise to pay the balance it became the actual owner of the notes.

J. F. Baldwin undoubtedly supposed on the day the offer was made and accepted that the Lumber Company paying that day nearly one-third of the purchase price in cash would be able to pay the balance. The provision for the retention of the notes and lien as security is most significant:

"The above-mentioned notes and purchase-money liens to secure same to be retained by said Isabella C. Baldwin until said last three named payments shall be made."

She did not deliver the notes into the hands of the purchaser because she proposed to retain them, and did retain them, to secure to herself the fruits of the contract. The language, "until said last three named payments shall be made," does not limit the holding of the security to the time fixed for the deferred payments, and delivery when they were made, nor does it suggest a reverting ownership in the notes if the payments were not made when promised. The security was to be held until those deferred payments were made, whatever the time might be. Of course, if they were not made, Mrs. Baldwin could enforce her security by foreclosing the lien which secured the payment of the notes out of the land.

It is significant that the time of payment of the purchase money under the agreement evidenced by the receipt of January 5, 1899, was not of the essence of that contract, and it cannot be reasonably doubted that the payment of the $11,000 consideration in that agree-

ment within a reasonable time after July 1, 1899, would have required Mrs. Baldwin to deliver the notes to the Lumber Company.

Further, 1899 was in a period of country-wide financial depression. Much of the timber had been cut off of the land, and there was probably no market for land of that kind. Mrs. Baldwin wanted money. Reynolds was insolvent and could not pay, but his lumber company could and did pay $3,130 in cash. It was fortunate for her that any one was willing to buy those notes who could make a present payment of so much money on them. There was probably little doubt that the lands would not sell for nearly as much as the $19,000 outstanding.

It is argued by counsel for Mrs. Baldwin, relying on the rule that the pledgee of negotiable promissory notes has no right upon the pledgor's default to sell the notes to pay the debt, but must await their maturity and collect them in due course, that the intention of the parties could not have been to enter into an executed agreement passing the title to the notes, for the reason that in such case Mrs. Baldwin would be bound to await the maturity of the notes and collect them as best she could, and would have gained by the agreement nothing in point of time in closing up the timber land transaction.

The answer to this is that the Reynolds note due January 1, 1900, would become due six months before the time of the last payment under the contract, and the Reynolds note due January 1, 1901, would become due only six months after that time, and she could, no doubt, upon default of either or both of the deferred payments, enforce the pledge of the Reynolds notes by foreclosing the lien securing them.

It is claimed, also, that the legal title to the notes did not pass because they were not indorsed, and therefore, if the parties had intended to pass the legal title, the notes would have been indorsed. There is no merit in the claim. The notes are lost, and it is not known what indorsements were on them. The first two notes taken up by Reynolds, found by Marsh, bear the indorsement of W. H. Baldwin without recourse. When Reynolds took them up, there was no occasion for the payee to indorse them. There is evidence suggesting that at one time W. H. Baldwin pledged all of the notes to some bank or left them there as collateral security. It is highly probable that at that time he indorsed them all. It may be that at the time the contract of sale June 22, 1899, was made J. F. Baldwin indorsed the notes as attorney for Mrs. Baldwin, executrix. No one can now say they were not indorsed. Be that as it may, and assuming that they were not indorsed, yet an equitable title would nevertheless pass, which the Lumber Company could enforce in a court of equity by setting forth the facts and praying that the lien which it in equity had might be foreclosed subject to Mrs. Baldwin's pledge. Inasmuch as the notes remained in J. F. Baldwin's possession, it is probable that it never occurred to any one concerned in the transaction to make a present indorsement for the purpose of passing the legal title.

But Mrs. Baldwin says that in any event the agreement of June 22, 1899, was not made with the Standard Lumber Company, but with Reynolds, and she makes this the basis of a contention that the transaction was a mere compromise with Reynolds for the payment by him

of a less sum than the debt, and, the terms of the compromise not having been complied with, his original debt to her is restored to its full amount. There is no merit in the claim.

When the receipt of January 5th was given the Lumber Company, and Mrs. Baldwin's ownership in the third $3,000 note was transferred to that company, she knew that it had then bought, to that extent, her rights against Reynolds. She knew that on June 22d the cash payment of $3,130 on the day her offer was made, and accepted, was made by the check of the Lumber Company.

It is claimed by Mrs. Baldwin that, in the statements made to her by J. F. Baldwin and Hafner of moneys collected for her, her attention was not specifically directed to the fact that any of the moneys actually paid by the Lumber Company were in fact paid by it. This claim has no force for the reason, among others, that in J. F. Baldwin's account beginning September, 1898, and ending January 13, 1899, there is an item: "Jan. 5, collected T. J. Reynolds' note due Jan. 19 (1899?) $3,000.00." And on the same day: "Collected all interest to Jan. 1, 1899, $570.00." These entries on their face would indicate that Reynolds had paid that note and interest; but that payment was in fact made by the Lumber Company under the contract of January 5, 1899. Mrs. Baldwin knew it and relinquished to that company her rights under the note. The payments afterwards of $693, February 19, 1900, by check of the Standard Lumber Company, the check of the Lumber Company July 24, 1900, for $1,085.45, the check of the Lumber Company of March 22, 1901, the check of the Lumber Company of March 30, 1903, $1,164 were not, it is true, specifically shown in the statements as having been paid by any other than Reynolds or on his account, yet the check of the Lumber Company by E. A. Marsh, vice president, May 13, 1903, to the order of Hafner, attorney, for $600 was sent to Mrs. Baldwin, she indorsed it, got the money herself, and knew that the Lumber Company had paid it. With actual knowledge that the Lumber Company had bought one of the Reynolds notes for $3,000 and was holding it against him with his knowledge, with knowledge that the $3,130 cash payment on the contract of June 22d was made by check of the Lumber Company, with knowledge that long after the date of the last payment to be made on the contract the Lumber Company itself paid at least $600 and having in the meantime received several payments from somebody, it will not do for her now to say that she was not aware the Lumber Company had any interest in the contract of June 22d, or to claim, as she does, that all the moneys she received were from or for Reynolds or his estate in part payment of his original notes. The payments made to Hafner by the Lumber Company and transmitted to her were known by him to have been paid by it. He also knew of Reynolds' insolvency and of his death. Whatever may have been the limits of Hafner's authority, he was confessedly Mrs. Baldwin's agent to collect money, and the knowledge acquired by him during the discharge of such duties and pertinent to their proper discharge must be imputed to her. Mechem on Agency, § 718 et seq.

It is immaterial what Reynolds' motives were in accepting the offer

of sale himself. He had not the means to carry out the contract himself in any event. What Mrs. Baldwin wanted was to get money, and it was immaterial to her whether Reynolds paid the cash on the day her offer was made, or the Lumber Company paid it. That Reynolds might transfer his rights under the contract was expressly provided for by its terms.

It is not disputed that acceptance of a contract may be by conduct. The facts afford strong circumstantial evidence that on June 22d Reynolds named the Lumber Company as the beneficiary under the contract, but, in the absence of direct proof upon the point, it is held on all the facts that the Standard Lumber Company's assumption by the agreement was ratified by Mrs. Baldwin. Indeed, Mrs. Baldwin ought not now be permitted to deny acceptance by the Lumber Company. The cash payment and all subsequent payments were in fact made by the Lumber Company. All payments made after Reynolds' death in October, 1902, must have been paid by the Lumber Company, and Mrs. Baldwin is chargeable with Hafner's knowledge and of the source from which the several payments came, and she personally received the $600 check from the Lumber Company.

Four payments were made extending over a period of nearly three years after the date the last payment was to be made under the contract. At no time while receiving these payments did Mrs. Baldwin inquire on what or whose account they were received. The Lumber Company certainly believed it was the acceptor of the offer to sell and made its payments during all those years with that understanding. It must be held that Mrs. Baldwin is estopped to deny that the payments were made by the Lumber Company as the actual acceptor of her offer to sell.

[2] The next subject to be disposed of is Mrs. Baldwin's claim of want of authority in Hafner to make the contract with Marsh of May, 1903, by which the claim of Mrs. Baldwin and the Lumber Company together amounting to $19,000 was to be enforced and the lien on the land foreclosed in Mrs. Baldwin's name for joint account, the amount due Mrs. Baldwin under the agreement of June 22d to be first paid and the balance to be paid to the Lumber Company. Both Marsh and Hafner acted upon the agreement of June 22d as still in force. If their assumption in this respect was correct, the agreement worked no injustice to Mrs. Baldwin. She was to get all the money she was entitled to, and, in addition, was to have the troublesome mineral rights claimed by several persons holding under Rodbourn or his assignees disposed of. These claims were recorded in Rowan county, and were of such a character as to be a cloud upon her title, both to the minerals and the land itself. The purpose was to shut them out and divide the proceeds of the land in such a way that both parties would participate in substance as provided by the agreement of June 22d. The suit has, in fact, resulted in eliminating all those claims against the mineral rights.

It may be admitted that the acceptance by Mrs. Baldwin of payment on account of the Lumber Company's contract would not have estopped her from enforcing the lien securing the Reynolds notes

pledged with her, although it is probable she would have been required to give reasonable notice to the Lumber Company of her intention to enforce her security; but, assuming her right on the day in May, 1903, the Hafner-Marsh agreement was made, to have her lien enforced, inquiry will now be made into the extent of Hafner's authority and into the propriety of her now claiming that Hafner had no authority from her to make the agreement with Marsh (May, 1903) further extending the time of the payment of the balance of the purchase money under the contract of June 22d, and providing for the enforcement of the lien in the joint interest of the parties by bringing this suit (August 26, 1903).

Hafner's authority was no more restricted than J. F. Baldwin's. J. F. Baldwin made the receipt of January 5, 1899, and the contract of June 22, 1899, in Mrs. Baldwin's name. Of the latter she had express knowledge and ratified it, and from the fact that the third Reynolds note for $3,000 was eliminated in the contract of June 22d as if paid she must have known of the contract made for her by him January 5, 1899, and acquiesced in it or ratified it. These, and other circumstances, show that Baldwin's authority was so broad that it included the execution of important contracts for her embracing large reductions in the Reynolds' debt; and, while she claims that Hafner had no authority to do anything but collect money for her, yet there is nothing to show that the scope of his authority was any less than the broad powers Baldwin had. On the contrary, she trusted Hafner as she had Baldwin, to do "as he thought best," and the record shows that it was the custom for Hafner to make contracts in his own name with other debtors of Mrs. Baldwin. His statements show that he accounted to her for the moneys received from them, and there is nothing to indicate any objection on her part to his acting in that way for her. When Hafner was in charge, much of the lumber had been taken from the land, and future distant value lay to a large extent in the promise shown by the second growth of trees. At all times, certainly during J. F. Baldwin's and Hafner's administrations, the payment of the notes must have been involved in some doubt, and the management of the matter for Mrs. Baldwin's best interests was always a problem of a kind most properly intrusted to a lawyer familiar with the transactions and who would be called upon frequently for services not strictly having to do with the collection of money, but of broad management of such a nature as to bring the best results for his client. Of such a character were the duties of Baldwin and Hafner.

Hafner indorsed some of the payments upon the contract which he held, as paid on the contract and transmitted the moneys to Mrs. Baldwin during a period of nearly three years after the time for the last payment under the contract was fixed. She made no inquiry during all that time, and Hafner had every reason to think he could make an agreement for her which would bring about the payment of the balance due her, as well as the elimination of the claims to the mineral rights, and her dealings with him, as they had been with J. F. Baldwin, were of such a nature as to lead him to think that he

could so act in her behalf. That he had the power, under the circumstances, to agree as he did with Marsh, can scarcely with reason be denied.

It is not necessary to decide whether he could agree to give to the Lumber Company a half interest in the reserved mineral rights or not. That question is not now before the court.

But, if Hafner did not in fact have actual power to make the agreement, yet in another aspect of the case justice requires the holding that Mrs. Baldwin cannot now be permitted to deny Hafner's authority to deal with Marsh as he did. The Lumber Company had paid prior to Marsh's first visit to Hafner in the spring of 1903 the cash payment of $3,130, June 22, 1899, and $1,085.45 July 24, 1900, indorsed on the original contract held by the Lumber Company as received for it to apply, when paid, upon the contract. This indorsement was made "Isabella C. Baldwin by Edward C. Hafner." The payment of $693 March 22, 1901, was indorsed the same way. It paid, also, $1,164 March 30, 1903, and the $600 check to Hafner indorsed to Mrs. Baldwin and indorsed by her when she received the money. In the absence of any notice from her, Marsh was entitled to believe that Mrs. Baldwin not only knew that the Lumber Company was in fact paying these moneys, but by the receipts of the money so indorsed by Hafner during nearly three years after the time fixed for the last payment in the contract that she did not consider time of payment as of the essence of the contract. Her conduct and silence led the Lumber Company and Marsh to believe Hafner had authority to act for her as he had assumed to act, and had authority to foreclose the lien which by virtue of the contract of June 22d was held jointly for the purpose of enforcing the payment of the Reynolds notes. It cannot be supposed that the Lumber Company would have continued to pay large sums of money except with the understanding and belief that the payments were made on the contract.

If Mrs. Baldwin had offered to pay back the sums of money she has received after the date the last payment was to have been made, there might possibly be some shadow of propriety in her claim that the contract was not binding on her, but she has not repaid nor offered to repay these sums, and thereby restore the Lumber Company pro tanto to its former position. Even then the Lumber Company would be the owner of the third note for $3,000, though possibly subordinate in right of payment to the other notes.

She knew also that Hafner in 1903, had filed a petition in her name to foreclose the lien securing the Reynolds notes, and made no objection to it or inquiry concerning it. It was through this petition that this suit was instituted.

In her petition she alleges the amount of the debt to her to be $19,000 and interest, and prayed for a foreclosure of the lien to pay the same. She has known at least since some time in 1906, when Mr. Stephens took charge of her affairs, of the Lumber Company's claim, and has never amended or attempted to amend her petition setting forth the interest of the company, even to the extent of the amount she admits to be due it or is willing it should be paid. It

was on her motion, April 24, 1906, that the case was referred to a special master to ascertain the amount due her. No notice was given to the Standard Lumber Company of the fact. Nothing was done under the reference until June, 1908, when she gave her deposition, and, while the Lumber Company was not represented in the proceedings before him, yet the special master himself in his report, December 24, 1908, found from her testimony and the documentary evidence that there was another theory applicable to the contract of June 22d, other than her claim that it was not binding, and on that basis made separate findings of the amount due her; and it was not until after the findings of the master had shown that the allegation in her petition of sole ownership of the $19,000 and the lien securing the same was not true, was the Standard Lumber Company notified that the interest it supposed by agreement it had in the litigation needed attention. It then of its own motion, without having been made a party to the case, filed its intervening petition, March 31, 1909, setting up its claim, and that the suit was brought in the first instance in her and its joint interest.

It is not intended here to attack Mrs. Baldwin's good faith, but to consider only the legal effect of her conduct as viewed by a court of equity. The litigation as a result of the agreement will bring about a sale of the property; will bring her as much as she is entitled to, and has eliminated the claimants to the mineral rights, and from May, 1903, until Marsh was notified of the special master's findings, at some time between the master's report, December 24, 1908, and the filing of the Lumber Company's intervening petition, March 31, 1909, Marsh had no reason to suppose that the agreement with Hafner was objected to by Mrs. Baldwin on any ground. Justice, as administered by courts of equity, requires the holding that, if Hafner did not have actual authority to make the agreement of May, he had apparent authority, which is quite as effective (Mechem on Agency, §§ 84, 86, 279, 282, et seq.; Clark & Skyles, 502), and that Mrs. Baldwin is estopped, both by the circumstances prior to its execution and the conduct and results of the litigation since the suit was brought, to deny Hafner's authority to make the agreement and the right of the Lumber Company to receive the fruits of it.

The decree of the Circuit Court is affirmed, and the cause will be remanded, with directions to the Circuit Court to carry its decree into effect.