**PORTER, Price Administrator, v. MERCADO.**
Civ. No. 4233.

District Court, Puerto Rico.
May 24, 1946.

George M. Paddack, of San Juan, P. R., for plaintiff.

Pedro M. Porrata, of Ponce, P. R., for defendant.

COOPER, District Judge.

At the time of the execution of the contract of March 3, 1944, there was no specific ceiling price for blackstrap molasses. The general regulations promulgated prior thereto applied to the sales of all commodities. This means that the ceiling price of molasses on the 3rd of March 1944 was the highest price at which defendant sold molasses during the base period of April 10 to May 10, 1942. The evidence presented establishes the ceiling price as of March 3, 1944, at 17¢ per gallon. Counsel for the Administrator insists that the contract was not completely executed until the molasses was withdrawn from the tanks of the seller. If that interpretation is sound it would follow that the ceiling price for this molasses would be 13.6¢ per gallon. I cannot accept this view. The contract in unmistakable terms provides that delivery is to be made to the buyer as and when the molasses is placed in the tanks of the seller. In other words, the placing of the molasses in the tanks of the seller was accepted by the purchases as a delivery. On May 9, 1944, an amendment to the regulations applicable to this case became effective and the maximum or ceiling price for blackstrap molasses was fixed at 13.6¢. Any deliveries made after the 9th of May 1944 could not legally exceed the maximum fixed by the amendment. There can be no doubt that the amount of molasses placed in tanks in accordance with the terms of the contract prior to May 9, 1944, was 887,985 gallons. Thereafter the defendants placed in tanks of the seller 362,055 gallons making a total of 1,250,040 gallons. It is clear, therefore, that the contract as to 887,985 gallons was completely executed before the effective date of the amendment of May 9, 1944. The parties surely had a right to contract as to the time and place of delivery and the fact that there may have been a mingling of molasses in the tanks does not affect the fact of a delivery in accordance with the contract. The mingling did not deprive any purchaser of the thing purchased. This is not a case where the mixing of commodities prevents identification and, therefore, makes a delivery impossible. A purchaser who agreed that his commodity is to be delivered in a tank with knowledge that it will be mixed as charged by the Administrator should not be heard to challenge the delivery of the commodity involved. Another question which requires attention is plaintiff's contention that a delivery of molasses during the base period of April 10 to May 10, 1942, to Romaguera e Hijos fixed the minimum or ceiling price at 13¢ per gallon in stead of 17¢ per gallon as claimed by the defendants. The Romaguera transaction involved a sale by defendants to Romaguera of 1,800,000 gallons. The contract was negotiated in January 1942 and actually signed in February; only a small part of the molasses was delivered during the base period. During that same period, however, defendants sold and delivered molasses to various defendants all of whom paid 17¢ per gallon. The Administrator, however, insists that the ceiling price should be 13¢ rather than 17¢ as the sale to Romaguera was a sale to a person of the same class as Destileria Serralles. This would be true if quantity of a single purchase is to control. It seems to me, however, that this is not the rule. Romaguera

e Hijos bought molasses to be re-sold and not to be consumed by it. Persons of the same class as Destileria Serralles would be those who purchased molasses to be consumed by them and not re-sold. It is the use of the commodity, therefore, by the purchaser which should determine class.

In order to effect a delivery of a commodity or personal property it is not essential that it be moved from one place to another. It is sufficient that the parties agree that control or dominion is vested in the purchaser and held at such place as the purchaser may designate. In this case, the record shows not only the delivery was made in the tanks of the seller but the purchaser had the molasses insured for its benefit and protection and it made payments on account of the purchase price upon a certificate of delivery to the tanks of the seller. The relation of the parties under this contract was first that of buyer and seller and then as the molasses were delivered to the tanks, there existed substantially the relation of bailor and bailee. The molasses belonged to Destileria Serralles when produced and the contract was completed when the molasses were delivered to the tanks of the seller in accordance with the terms of the contract. I hold, therefore, that delivery was completed as to all molasses placed in the tanks of the seller prior to May 9, 1944, and at that time the sale and delivery of 17¢ per gallon did not violate any provision of law or regulation.

To accept the contention of the Government as to delivery the Court would have to hold that delivery was not made until between September and December 1944 and to adopt this view would be to ignore the specific terms of a contract duly entered into.

Counsel for the Administrator called attention to the fact that the delivery in this case required an actual rather than a constructive delivery. So far as I have observed no one has suggested that a constructive delivery would be sufficient in a case of this character. There can be no question as to the soundness of the proposition stated. The delivery was actual. It should be again emphasized that a delivery is complete when dominion or control of the commodity purchased vests in the purchas-

er. In this case Destileria Serralles could have removed the molasses from the seller's tanks at any time after it had been placed therein by the seller. The record in this case shows that prior to the execution of the contract of March 3, 1944, defendants' manager and one or more of its representatives contacted the Office of Price Administration in San Juan with the purpose of ascertaining the then ceiling price for blackstrap molasses. The information obtained after several conferences and some correspondence was that the ceiling price at that time (February-March 1944) was the highest at which defendants had sold molasses during the base period. There is also in the contract a provision which states that in case the Office of Price Administration or other person or agency having jurisdiction of the subject matter should thereafter determine that the price of 17¢ per gallon at that time was a violation of the laws or regulations, that proper adjustment would be made. There is nothing in the record to indicate that the Office of Price Administration or any other agency of the Government determined that there had been a violation of the maximum price regulation. Subsequent to May 9, 1944, no suggestion was made to defendants that the deliveries made after May 9th had been in violation of the regulation. No opportunity was offered the defendants to make the adjustment which the contract anticipated. I do not overlook the fact that under the law the defendant is charged with notice of the change in the ceiling price effective on May 9th. Defendants, therefore, must pay to the Government the sum of $12,-309.86, this being the amount of overcharge on molasses delivered after May 9th. The amendment to Section 925, subdivision (e) of the Price Control Act, 50 U.S.C.A.Appendix, provides that suit may be brought by the purchaser of the commodity if there has been an overcharge. Failure of the purchaser to take advantage of this provision of the law authorizes the Administrator to sue on behalf of the Government for overcharge and penalties. I quote from the Section as amended:

"In such action the seller shall be liable for reasonable attorney's fees and costs as determined by the court, plus whichever of

the following sums is the greater: (1) Such amount not more than three times the amount of the overcharge, or the overcharges, upon which the action is based as the court in its discretion may determine, or (2) an amount not less than $25 nor more than $50, as the court in its discretion may determine."

■■ Then follows the provision which authorizes the defendant to show that the violation of the regulation was neither willful nor the result of a failure to take practicable precautions. If the defendant succeeds in showing that the violation was not the result of willfulness nor of the lack of precautions, the law fixes the amount which may be recovered from the defendant which is the overcharge or $25, whichever is greater. Some of the cases seem to hold that whenever there has been a violation of regulation, the Court has no discretion except to grant a judgment for three times the amount of the overcharge. To adopt that construction would mean to strike from the Act the words "not more than three times the amount of the overcharge" and also the provision that the Court may exercise discretion. This exercise of discretion has no reference to the so-called Chandler defense. A defendant who is charged with violating the regulation may in answer to the charge show that the violation was not due to willfulness or a lack of practicable precaution. That is not, of course, a complete defense but it fixes the amount which may be recovered from the defendant, to wit: The amount of the overcharge. There is some conflict among the appellate courts as to this question. The weight of opinion seems, however, to be in favor of the conclusion which I have reached in this case. I think that where the Chandler defense is not asserted the Court in all cases is clothed with discretion to enter such judgment as it deems authorized under all the circumstances of the case but it may not enter a judgment for less than the overcharge and it may not be more than three times the amount of the overcharge or not more than $50 nor less than $25, as the case may be. Where the so-called Chandler defense is asserted and is established the Court may not enter judgment for more than the overcharge. Where the Chandler defense is asserted and

is not sustained by proof, the Court would still have the discretion to fix the amount allowed at not less than the overcharge nor more than three times the overcharge. This interpretation gives vitality and force to all the language of the amendment whereas if I accept the interpretation urged upon me by counsel for the Administrator, the effect would be to nullify at least a part of the statute. This conclusion is sustained by the case of Bowles, Administrator, v. Krodel, 7 Cir., 149 F.2d 398, which case was cited with approval in Bowles, Adm. v. Goebbel, 8 Cir., 151 F.2d 671, 673.

■ I have given careful study to the entire record in this case including the stipulations and documents and I am satisfied that the defendants in this transaction did not deliberately violate or ignore the laws or regulations thereunder. If the Court has discretion, as I think it has, this is a proper case for its exercise.

A judgment will be entered accordingly in the sum of $12,309.86 and costs to be determined hereafter.

The motion to dismiss filed by defendant before the trial and the motion for nonsuit filed after the trial, is denied.

### Statement of the Case.

The plaintiff sues the defendants alleging a violation by defendants of General Maximum Price Regulations and Revised Maximum Price Regulation #183, and prays for judgment in the sum of $127,500 that being three times the amount alleged to have been charged on a sale and delivery of blackstrap molasses to Destileria Serralles, Inc. Defendants deny a violation as alleged in the complaint. Considerable testimony has been taken in open Court and also by stipulation.

I make the following:

### Findings of Fact.

I. On March 3, 1944, the defendants sold to Destileria Serralles Inc. a total of 1,250,000 gallons of blackstrap molasses at the agreed price of 17¢ per gallon.

II. Delivery of the molasses was accomplished in accordance with the terms of the contract and completed by defendants between March 4, 1944, and June 24, 1944, by

placing said molasses in a tank of defendants.

III. Destileria Serralles, Inc., at its own risk and expense and by its own transportation facilities withdrew said molasses from defendants' tank during the period of September 12, 1944, to December 7, 1944.

IV. Prior to entering into the contract of March 3, 1944, defendants' manager and attorneys communicated with the Office of Price Administration in San Juan, Puerto Rico for the purpose of ascertaining the then maximum or ceiling price for blackstrap molasses. Such inquiries resulted in a statement of said office that the then ceiling price for blackstrap molasses was the highest price at which defendants had sold blackstrap molasses during the base period April 10, 1942, to May 10, 1942.

V. The total amount of molasses placed in the tanks as per the contract was:

(a) 887,985 gallons between March 4, 1944, and May 8, 1944, and (b) 362,055 gallons from May 9, 1944, and June 24, 1944.

VI. Defendants billed Destileria Serralles, Inc. on account of the sale of said molasses, as follows:

On March 31, 1944, $80,314.45 for 472,438 gallons;
On April 30, 1944, 54,715.35 for 321,855 gallons;
On May 31, 1944, $46,183.90 for 271,670 gallons and
On June 24, 1944, $31,286.29 for 184,037 gallons,

which sums were paid by the buyer on April 7th, May 9th, June 20th, and July 18, 1944, respectively.

VII. During the base period April 10th-May 10, 1942, defendants delivered to Jose Romaguera e Hijos, 45,484 gallons of cane blackstrap molasses under a sale contract therefor executed on February 12, 1942, covering 1,800,000 at a price of 13¢ per gallon.

VIII. During that same base period defendants sold and delivered at the mill blackstrap molasses at the rate of 17¢ per gallon to the following:

1. Jose Martinez Zayas, a buyer from Coamo ............................... 7,300 gals.
2. Primitivo Torres, defendants' employee ................................. 50 "
3. Gumersindo Vazquez, a colono ........ 4,200 "
4. Santia Olineri de Ferrer, a colono.... 100 "
5. Pedro J. Faria, a colono ............... 500 "
6. Jose Perez Roche ...................... 1,000 "
7. Felipe Santiago ....................... 1,800 "

IX. The highest price charged by defendants to a purchaser of the same class as Destileria Serralles, Inc. during the base period was 17¢ per gallon.

X. At the time of the execution of the contract on March 3, 1944, Destileria Serralles Inc. agreed to and did accept as a part of its purchase 200,000 gallons of molasses then in the seller's tanks. Destileria Serralles, Inc. was at the same time advised that there were certain quantities of molasses which had either been promised or previously sold to other purchasers and that said molasses was then in the tanks of the seller.

XI. Defendants did not purposely or intentionally violate the regulations.

XII. Destileria Serralles, Inc., purchased the molasses and used it in its distillery in the production of rum. Romaguera e Hijos purchased the molasses for resale. Other purchasers listed used the molasses for their own consumption.

## Conclusions of Law.

1. The price of 17¢ per gallon charged by the defendants from March 4, 1944, to May 9, 1944, was not in violation of the General Maximum Price Regulation as it was the highest price charged purchasers by the defendants of the same class.

2. The price of 17¢ per gallon for molasses delivered to tanks after May 9, 1944, was a violation of the applicable price regulations then in force. Molasses delivered to the tanks of the seller for the buyer after May 9, 1944, was subject to Price Regulation #183 and therefore, should have been sold at 13.6¢ per gallon.

3. The defendants must pay to the Government in this case a sum of $12,309.86 being the overcharge on molasses delivered to seller's tanks after May 9, 1944.