**STAR STEEL SUPPLY CO. v. BOWLES, Adm'r, OPA.**

**No. 10261.**

Circuit Court of Appeals, Sixth Circuit.

Feb. 10, 1947.

Jos. B. Beckenstein, of Detroit, Mich. (Harry N. Grossman, of Detroit, Mich. on the brief), for appellant.

Leanora S. Gruber, of New York City (George Moncharsh, David London, and Albert M. Dreyer, all of Washington, D. C., and Samuel Weiner, of Cleveland, Ohio, on the brief), for appellee.

Before SIMONS, ALLEN, and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

The Administrator of the Office of Price Administration filed a complaint against appellant corporation, The Star Steel Supply Company, charging violations of Revised Price Schedule No. 49, Resale of Iron and Steel Products, Section 1306.159(k) (1) (III), in the sale and delivery of iron and steel products for prices in excess of the maximum established by the regulation. Judgment on behalf of the United States was prayed in treble the aggregate amount by which the consideration received by appellant from the sales exceeded the maximum prices permitted by the schedule. As further relief, an injunction was demanded against sales by appellant of iron and steel products at prices in excess of those established by Revised Price Schedule No. 49.

Upon conclusion of a trial by jury, the district court directed a verdict in favor of the plaintiff administrator in the penal sum of $1,774.58, that having been proved to be the exact amount of the excess in sales prices over permissible maximum prices. The claim of the administrator for the treble amount was denied, as was likewise his prayer for an injunction.

The facts are not in dispute and only questions of law are presented on appeal.

Section 1306.159(k) (1) (III) provides: "(k) Maximum delivered prices for shipments in carload quantities, and in certain specific cases. (1) Prices in excess of the mill prices provided under Revised Price Schedule No. 6 shall not be charged by any person for: * * * (III) Shipments of any quantity not put through the operations commonly known as the warehousing of iron or steel products."

The appellant corporation, which for the past twenty-five years has had its offices

and warehouses in Detroit, is a wholesale jobber of iron and steel products bought from mills and resold to its own customers. The Burton Company, twice as old, is operated as a branch or division of appellant, whose gross business for several years past has averaged around a million dollars per annum. Appellant keeps on hand in its warehouses a stock of merchandise, the value of which ranges from $150,000 to $500,000.

The judgment against appellant was based upon five transactions. The proof established that it had purchased and received, at the mill price established by Revised Price Schedule No. 6, five separate truck loads of iron and steel products from the Reeves Steel Manufacturing Company; that each of the five truck loads had been received at a warehouse of appellant; stored there overnight on the truck or trailer in which delivered; and reshipped to its customers next day in precisely the same form in which received from the mill. Three shipments of the iron and steel products were resold and reinvoiced to appellant's customer, the Richmond Heating Company, and two of the shipments to the Central Heating Company, at the warehousing price established by Revised Price Schedule No. 49, supra. No warehousing services were performed with respect to any of the five truck loads in controversy, the merchandise contained and delivered in the trucks not having been unloaded in the warehouse of appellant.

Appellant developed by testimony that no orders for the identical items received in the five shipments had been placed by it with the mill; that it had no knowledge of what the items were until the shipments were received; and that prior to the arrival of the merchandise at its warehouse, no purchase orders for the items had been received, but that on the same day or the following day the specific orders were obtained from its customers.

By letter of August 25, 1944, to the Office of Price Administration at Detroit, Michigan, the appellant explained its procedure in handling shipments of steel products to its particular customers, Richmond Heating Company and Central Heating Company. It was the custom of appellant to place orders with the mill two to four months in advance of expected shipping dates. The mill occasionally would send a load of "rejects." Appellant never knew what a shipment would contain until the truck arrived at the warehouse. To conserve labor in unloading and reloading some of the trucks, appellant would take the packing slips accompanying the shipments, call the two heating companies to ascertain whether the particular sizes on the load could be used and, if answered affirmatively, would write out an invoice of its own and thereupon hire the trucking company to deliver the load from its warehouse to one of the heating companies.

■ (1) The O.P.A. Administrator successfully maintained in the court below that the appellant company was included among those sellers required to perform warehousing functions in order to be privileged to charge reseller's prices; that warehousing functions had not been performed in the absence of physical unloading of the iron and steel products into a warehouse; and that, inasmuch as the merchandise in question had not been unloaded into a warehouse, the Star Steel Supply Company had violated the regulations by charging warehousing prices, which were on a higher level than mill prices.

Appellant contends that Revised Price Schedule No. 49 does not require a distributor of the type of appellant to maintain a warehouse or to perform warehousing operations as defined in Section 1306.157 [1]

---

[1] Amendment 13 of April 8, 1943, Section 1306.157(s), defines the operations commonly known as "the warehousing of iron or steel products" as meaning the "actual receipt and unloading of iron or steel products, purchased under the authority granted by the applicable regulations of the War Production Board governing the purchase for resale of iron or steel products in substantially the same form as received, into premises (not a public warehouse) equipped with facilities for performing such operations as receiving, stocking, sorting and grading, pipe threading or cutting, shearing, flame cutting or burning to size or shape, and shipping, which operations are necessary or incidental to the resale and distribution of the particular products brought into those premises."

in order to entitle the distributor to charge prices in excess of mill prices. It insists that the performance of warehousing operations for the purpose of qualifying within the higher price schedule is imposed only upon a producer who establishes and operates a warehouse in the redistribution of his own mill products.

However, under the express language of Section 1306.159(k) (III), maximum delivered prices for shipments in carload quantities in excess of the mill prices provided in Revised Price Schedule No. 6 (the lower level of prices) shall not be charged by any person for "shipments of any quantity not put through the operations commonly known as the warehousing of iron or steel products." The definition of "seller," when used in Revised Price Schedule No. 49, will be found in the regulation quoted below.[2]

The gist of the argument of appellant is that the necessity of maintaining warehouses and performing warehousing operations in order to justify charging prices in excess of mill prices relates only to producer-distributors: that is, to producers who operate warehouses for the redistribution of their own products. We cannot accept this argument as valid. To do so

would be to ignore the plain language of Section 1306.159(k), which provides distinctly that prices in excess of mill prices shall not be charged by any person unless the shipments are put through warehousing operations. The essential condition of warehousing is not limited to any type of seller, but is applicable to all types. This interpretation is supported by the explanation of the price structure in the Statement of Considerations for Amendment 22 to Revised Price Schedule No. 49 issued by the Administrator on April 22, 1944, the pertinent portions of which are quoted below.[3]

The protective purposes underlying the requirement that a warehouse be operated and warehousing operations be actually performed by all those who would qualify to charge the higher level of prices established by Revised Price Schedule No. 49 are further evinced in its preamble: "* * * A large proportion of the iron or steel products used in industry passes through the hands of jobbers, dealers and distributors of various kinds. In some cases, these middlemen have charged exorbitant and unwarranted prices. It is therefore essential that the price charged by these persons, as well as the price

_____

[2] Under Section 1306.157(b), a seller is thus defined: "(b) 'Seller' means any person who resells iron and steel products to any other person, whether as distributor, jobber, dealer, agent, broker, merchant, exporter, including any person who acts as an intermediary in any connection with such resale, or otherwise; provided, That: (1) the term shall not include producers of iron or steel products whose activities are covered by Revised Price Schedule No. 6—Iron and Steel Products, except insofar as such producers operate warehouses, branches or affiliates engaged in the redistribution of iron or steel products. The operation by producers of mill depots for the purpose of distributing iron or steel products manufactured by such producers shall not be considered a resale within the terms of Revised Price Schedule No. 49, but is a sale covered by Revised Price Schedule No. 6."

[3] "Revised Price Schedule No. 49—Resale of Iron or Steel Products, establishes two levels of maximum prices. Generally, the higher level applies where material has been put through ware-

housing operations while the lower level applies where such operations have not been performed. * * *

"The dual price structure embodied in the Schedule reflects that which develops in the industry under normal marketing conditions and results from the fact that warehousemen render services which add to the utility of the products and have costs and assume risks which distinguish them from persons who merely act as intermediaries between producers and buyers. Persons operating warehouses ordinarily maintain inventories which enable them to make prompt deliveries and to sell in quantities too small to be conveniently handled by mill producers; they also have equipment for cutting, threading or shearing and thus can meet various special requirements for which standard sizes and shapes are not satisfactory.

"The definition of 'operations commonly known as warehousing' set forth in Section 1306.157(s) was designed to restrict the charging of the higher level of prices established by the Schedule to cases where the seller performs a genuine warehousing operation."

charged by the producer, be kept within reasonable limits. To protect both the consumer and the jobbers, dealers, and other distributors who have maintained a reasonable price level, it has been determined by the Office of Price Administration that a price schedule covering all resale of iron or steel products should be issued."

Appellant contends further that, even assuming that the pertinent regulation required it to perform warehousing operations in its warehouse to qualify it to charge the higher level of prices, the physical unloading and immediate reloading of the steel products were unnecessary and duplicated expenses not intended to be imposed upon the distributor. Its interpretation of Section 1306.157(s) is that the actual receipt of products at its warehouse and shipping them out without unloading, where the title to the merchandise passed from producer to distributor and then to distributor's customers, constitutes substantial compliance with the Section. The argument falls, for Section 1306.157(s) requires actual receipt and unloading. "Unload" is a simple word, meaning to "remove the burden, cargo or freight from" [The New Century Dictionary, Vol. III, p. 2101]; to "take off (something carried or conveyed); to discharge (a cargo)" [The Shorter Oxford English Dictionary, p. 2306]; to "take the load from; to discharge of a load or cargo; to disburden. Hence, to relieve anything onerous. To discharge or remove, as a load or a burden; as, to unload the cargo of a vessel. The act of unloading anything." [Webster's International Dictionary, p. 2245].

Moreover, the argument of appellant that substantial compliance with the regulation, in the circumstances of the case, is adequate to fulfilment of the requirements of the regulation will not stand. A similar argument that the letter of an O.P.A. regulation should not have been applied was rejected in Fontes v. Porter, 9 Cir., 156 F.2d 956, decided July 29, 1946. The Court of Appeals said that the good faith of appellant and lack of any showing of wilful violation on his part operated only to reduce the damages to the amount of the overcharge. In the instant case, the dis-

trict judge allowed the recovery of no more than the overcharges.

In Porter, Administrator, O.P.A. v. Nowak, 1 Cir., 157 F.2d 824, 825, the appellate court reversed a trial court decision that an O.P.A. Regulation "was satisfied for the reason that it, like a statute, is to be interpreted in the light of its policy, and its policy is not to impose damages for technical violations." The Court of Appeals did not consider the requirement of the regulation there under interpretation, nor do we consider the letter of the regulation here involved, "violative of common sense, absurd, or unduly harsh or unjust in its consequences."

We have studied the emerald smuggling case relied upon by appellant, and find that the authority has no remote bearing on the issue presented here. United States v. 218½ Carats Loose Emeralds, D.C.S.D. N.Y.1907, 153 F. 643; affirmed 2 Cir., 154 F. 839.

The argument that the expressed reluctance of the district judge to render judgment against appellant fortifies its position is not impressive. After obviously careful consideration, he reached the conclusion that there had been a technical violation of the regulation which impelled him to render judgment for the overcharges against appellant. He exercised sound discretion in denying the prayer for injunction and for treble damages.

(2) The contention is made by appellant that the regulation as applied by the district court constituted confiscation of its property without due process of law in violation of the Fourteenth Amendment, inasmuch as "the ruling of the district judge amounted in effect to a ruling that under the regulation the appellant was compelled to conduct its long established business at a loss, as appellant was prohibited thereby from earning a legitimate profit on its own investment, and was also prohibited from including in its price structure its necessary business overhead costs."

Testimony was adduced to the effect that, before the war, a jobber like appellant made its profit on direct shipments from the mill to the customer, by receiving a discount at the mill; but that, since the war, mills no

longer allow discounts on direct mill shipments. In consequence of the regulation requiring the jobbers to sell direct mill shipments at the same price at which the products are bought, there is no margin of profit on such transactions and this has caused appellant to cease to take orders for such shipments. It was shown that, on the five shipments here involved, the appellant paid commissions to its salesmen and shipment charges to the trucking company which redelivered the products.

The validity of a regulation, order, or price schedule issued by the O.P.A. Administrator may be attacked in no court other than the Emergency Court of Appeals, from which an appeal lies to the Supreme Court of the United States. Section 204(d) of the Emergency Price Control Act, as amended, 56 Stat. 23, 50 U.S.C.A.Appendix, § 924(d), expressly so provides. The constitutionality of the vesting of such exclusive jurisdiction in the Emergency Court of Appeals has been upheld by the Supreme Court in several different classes of litigation. Lockerty v. Phillips, 319 U.S. 182, 186, 187, 63 S.Ct. 1019, 87 L.Ed. 1339; Yakus v. United States, 321 U.S. 414, 429, 430, 431, 64 S.Ct. 660, 88 L.Ed. 834; Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892; Bowles v. Seminole Rock Co., 325 U.S. 410, 418, 419, 65 S.Ct. 1215, 89 L.Ed. 1700. See also the opinion of this court in Shrier v. United States, 6 Cir., 149 F.2d 606. This court is, therefore, without jurisdiction to pass upon the validity of Revised Price Schedule No. 49, or upon any other pertinent regulation of the O.P.A. Administrator.

■ (3) Finally, appellant argues, though somewhat mildly, that the district court was not justified in awarding a money judgment against it, for the reason that the action "was brought on the equity side of the court, and therefore, equitable principles and maxims are to be applied." The judge's statements in colloquy that the claim of O.P.A. was devoid of equities, and that the O.P.A. officials were in confusion as to the proper interpretation and intent of the Revised Price Schedule regulations are stressed.

But, notwithstanding his view of the equities, the district judge conscientiously performed his plain duty in awarding damages in the sum proven to be the amount of the overcharges. He followed the mandate of Section 205(e) of the Emergency Price Control Act, 56 Stat. 23, 50 U.S.C.A.Appendix, 925(e), later amended in respects immaterial to this controversy. See interpretative decisions: Bowles v. Goebel, 8 Cir., 151 F.2d 671, 673; Bowles v. Krodel, 7 Cir., 149 F.2d 398, 401; Bowles v. Hasting, 5 Cir., 146 F.2d 94; Bowles v. Heinel Motors (D.C.E.D.Pa.) 59 F.Supp. 759, affirmed by per curiam, 3 Cir., 149 F.2d 815; certiorari denied 326 U.S. 760, 66 S.Ct. 141; and Bowles v. Franceschini, 1 Cir., 145 F.2d 510, 512. In the last cited case, the Court of Appeals said: "The case before us is an action for damages under § 205(e) and not an action in the nature of a suit in equity under § 205(a). The position of the lower court appears to be that the Act confers upon the trial court discretion to grant damages or not to grant damages, as the court might think reasonable, where the seller 'unwittingly' violated the price ceiling. We find no language in § 205(e) which supports this view. The statute unequivocally provides that if a seller violates the maximum price ceiling he may be subject to an action either for $50 or treble damages, whichever is greater."

The judgment of the district court is affirmed.