## ANDERSON v. MERCADO.

## MERCADO v. ANDERSON.

### Nos. 4213, 4214.

Circuit Court of Appeals, First Circuit.
Aug. 25, 1947.
Writ of Certiorari Denied Dec. 8, 1947.
See 68 S.Ct. 220.

---

304

Arthur G. Silverman, of Washington, D. C. (George H. Layman, of Seattle, Wash., and J. J. Schalet, William E. Remy, David London, Albert M. Dreyer, and John Durbin, all of Washington, D. C., on the brief), for Clinton P. Anderson, Secretary of Agriculture.

Montgomery B. Angell, of New York City (Pedro M. Porrata, of Ponce, Puerto Rico, and Edward J. McGratty, Jr., and Davis, Polk, Wardwell, Sunderland & Kiendl, all of New York City, on the brief), for Mario Mercado e Hijos.

Before CLARK,[1] MAHONEY, and WOODBURY, Circuit Judges.

CLARK, Circuit Judge.

This action was brought by the Price Administrator under § 205(e) of the Emergency Price Control Act of 1942 as amended, 50 U.S.C.A.Appendix, § 925(e), to recover treble damages for the alleged delivery by defendant in Puerto Rico of 1,250,000 gallons of cane blackstrap molasses sold at an overceiling price. The sales price was 17¢ per gallon. The ceiling price urged by the Administrator is 13.6¢ per gallon, which would make the resultant overcharge $42,500, and the treble damages $127,500. Since the regulation setting the ceiling price claimed by the Administrator did not become effective until after defendant had made a contract for the sale of the molasses, the Administrator relies upon the fact of its storage in defendant's tank on the effective date of the amended regulation to show that delivery had not then been made; while defendant relies on pro-visions of the sale contract to show that, title having already passed, delivery had then been made and storage in its tanks was only for the convenience of the vendee. This was the primary issue in the case. Further questions arose as to the meaning of the specific regulation relied upon, particularly as to the meaning and applicability of the ceiling price, stated in an amount per gallon "delivered at the mill or at the mill tank"; as to the Administrator's alternative claim under the earlier General Maximum Price Regulation; and as to the defendant's contentions that the later regulation was inapplicable and the earlier one was not violated, and that in any event it had acted in good faith and should not be assessed the maximum statutory damages. The district court found an overcharge only on 362,055 gallons, the amount deposited in defendant's tank after the date of the Price Regulation, and gave judgment only for the overcharge without penalty or addition, namely $12,309.86. Porter v. Mercado, D.C.P.R., 67 F.Supp. 107. From this judgment both parties appeal.[2]

The facts out of which the controversy grew are undisputed. On March 3, 1944, defendant entered into a contract for the sale to Destileria Serralles, Inc., of all of its 1943-44 season's production of blackstrap molasses, estimated at 1,200,000 gallons more or less, at a price of 17¢ per gallon. Important provisions of the contract stated that the molasses became "the property of the Buyer as soon as produced by the Seller," gallonage to be determined on a basis of 12 pounds of molasses to each gallon; that "Delivery shall be made from June to December 15, 1944 and the Buyer binds itself to take away the total amount of molasses from the tanks of the Seller before the commencement of the 1944-45 grinding season should the latter commence before December 15"; that the molasses should be insured "by and for the benefit of the Buyer"; that "The Buyer shall take the molasses in the tanks of the

---

[1] Judge Clark of the Second Circuit, serving by designation.

[2] By orders of this court, assented to by the parties, Philip B. Fleming, Temporary Controls Administrator, was first substituted for Paul A. Porter, Administrator, Office of Price Administration, and thereafter Clinton P. Anderson, Secretary of Agriculture, was substituted for Philip B. Fleming.

Seller, at Rufina Central, at Guayanilla, or at Penoncillo, weighed on the scales of the Seller"; and that partial monthly payments should be made "for the quantity of molasses reported by the Seller to have been placed in its tanks for the Buyer." The parties are sharply at odds as to the meaning of these various provisions and particularly as to when delivery legally took place.

Pursuant to the terms of the contract, defendant deposited 1,250,040 [3] gallons of molasses in one of its tanks for the buyer's account between March 4 and June 24, 1944. Of these, 887,985 gallons were deposited before May 9, 1944, the effective date of a new maximum price regulation. The remainder was deposited on or after that date. The buyer made monthly payments against the reported deposits; but it did not commence withdrawals from the tank until September 12, 1944, and it did not complete the withdrawals until December 7, 1944. No molasses in the tank had been earmarked for the buyer; indeed deliveries totaling 10,052 gallons were made from the same tank to other parties. The parties stipulated that the storage in defendant's tank at the buyer's risk was due to the fact that the latter did not have sufficient storage facilities in which to keep the molasses as soon as manufactured by the defendant.

Previous to May 9, 1944, the ceiling price of blackstrap molasses in Puerto Rico was governed by the General Maximum Price Regulation of 1942, made applicable to sales and deliveries of commodities in Puerto Rico by Supplementary Reg. 13. 7 F.R. 3153, 4798. Under §§ 1499.2 and 1499.201 of these regulations, the maximum price chargeable for the commodity was the highest price charged between April 10 and May 10, 1942, to a purchaser of the same class. But this particular commodity, which comes from the sugar cane and is used in many cattle feeds and for the dis-tillation of spirituous and industrial alcohol, became a critical war material, purchased in large quantities by the government. To equalize these prices and to set one standard price, amendments were made to Revised Maximum Price Reg. 183, 8 F.R. 9532 (setting dollars and cents ceiling prices in Puerto Rico upon stated commodities) to fix a definite ceiling price of 13.6¢ per gallon for blackstrap molasses. The first of the two amendments, Amendment 32, effective May 9, 1944, applied to molasses "delivered at the mill." 9 F.R. 4820. The second, Amendment 45, effective August 2, 1944, stated the same ceiling price as applicable to molasses "delivered at the mill or at the mill tank." 9 F.R. 9218. Reg. 183, to which these amendments were thus added, prohibited the sale or delivery of any commodity listed therein at over the ceiling prices. To the extent, therefore, that Amendment 32 or 45 was applicable to the delivery of the molasses in question, defendant had made an overcharge of 3.4¢ per gallon.

Sec. 17(3) of Reg. 183 defines "to deliver" as "to transfer actual possession of the commodity to the purchaser." [4] The determination on the undisputed facts presented here as to when delivery legally took place is the ultimate conclusion of law upon which this aspect of the case turns. And in finding that as to the molasses already in the tank on May 9, 1944, delivery had taken place so that the ceiling price then set did not apply, we think the court erred. The court reached the result by holding that under the contract delivery occurred upon production of the molasses and that storage in defendant's tank was only for the buyer's convenience. But the regulation is applicable by its sec. 1: "Regardless of any contract, agreement * * * or other obligation"; and a merely constructive transfer, short of "actual possession," however defined by the parties, would be insufficient to render the

---

[3] This figure is as stipulated by the parties and found by the district court. In its monthly invoices to Serrallés, defendant reported total deposits of 1,250,000 gallons.

[4] This definition in substance seems generally accepted in the law of sales. Uniform Sales Act, § 76; P.R.Civ.Code, 1930, § 1351; Stamford Extract Mfg. Co v. Oakes Mfg. Co., 2 Cir., 9 F.2d 301; Goodhue v. State Street Trust Co., 267 Mass. 28, 165 N.E. 701; Harbison v. Propper, 112 Misc. 588, 183 N.Y.S. 508, 511

regulation inapplicable. Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 416, 65 S.Ct. 1215, 89 L.Ed. 1700; Bowles v. Beucher, D.C.Mass., 53 F.Supp. 984, 987; United States v. Lutz, 3 Cir., 142 F.2d 985, 989; United States v. Weiss, 2 Cir., 150 F.2d 17, 19, certiorari denied 326 U.S. 736, 66 S.Ct. 45, 90 L.Ed. 438. As a matter of fact we think that, whether viewed under the regulation or under the contract, delivery took place when Serralles removed the molasses from the tank, rather than when defendant deposited it in the tank.

While the molasses was in defendant's tank, Serralles had the right to possession. But it did not have actual possession until it had removed the molasses from defendant's tank and the molasses was in containers owned by it and under the hands of its employees. The idea that Serralles had possession of the molasses while it was in defendant's tank seems inconsistent with two other factors. None of the molasses in the tank was earmarked for Serralles; and, indeed, after the signing of the contract, deliveries from this tank were made by defendant to other purchasers. It seems that under the contract the parties to the sale themselves probably understood delivery to be the removal of the molasses. The contract specified that delivery be made from June to December 15, 1944, and immediately thereafter, in the same sentence, provided that if the 1944-45 grinding season began before December 15, Serralles would take the molasses away from the seller's tanks before then. Certainly the language strongly suggests that the taking away of the molasses was equivalent in the minds of the parties to its delivery. The manner of execution of the contract by the parties bears out this deduction. Deposit of the molasses in the tank was made between March 4 and June 24. Indeed in its monthly invoices to Serralles, defendant reported to Serralles that it had deposited 1,065,963 gallons or approximately 85 per cent of the total deposit by May 31, a date before delivery was scheduled to begin.[5] On the other hand, Serralles made all its withdrawals between September 12 and December 7, within the delivery period. Apparently withdrawal was the delivery contemplated. Since all deliveries were made after August 7, 1944, Amendment 45, supra, governed the transaction if deliveries were made "at the mill or at the mill tank."

This conclusion is not vitiated by an examination of other provisions of the contract. The contract provided that the molasses should be the property of the buyer when produced. This, however, did not indicate that delivery had been made. Whether or not title to existing property has passed is a matter governed by the intention of the parties, Uniform Sales Act, § 18; 1 Williston on Sales, 2d Ed. 1924, § 259, p. 252; Monagas v. Central Eureka, Inc., 41 P.R.R. 797, 803, 804; Hoffman v. Gosline, 6 Cir., 172 F. 113; Baldwin v. Reynolds, 6 Cir., 189 F. 852, 864; Burt v. Dutcher, 34 N.Y. 493, 496, and the absence of delivery is not at all inconsistent with the passage of title to property. Wright v. Frank A. Andrews Co., 212 Mass. 186, 98 N.E. 798; Hammer v. United States, 2 Cir., 249 F. 336; López & Morán v. Sobrinos de Ezquiaga, 34 P. R.R. 75; Pierce v. Gibson, 2 Ind. 408, 412; Koepp v. Security-Home Trust Co., 47 Ohio App. 487, 192 N.E. 138. Another provision of the contract directed that the molasses be insured by the buyer. This was a natural provision, in view of the passage of the title to Serralles, and probably unnecessary, since a reasonably prudent buyer would have insured anyhow. A final provision directed payment by the buyer against monthly reports by the seller of its deposits in the tank. This provision, too, follows naturally from the fact that the buyer had title and, like the other two provisions, is in no way inconsistent with the absence of a completed delivery.

Since the date of delivery has been established as after August 2, 1944, the next question is, Was it made "at the mill or at the mill tank"? If it was made at either of these places within the meaning of Amendment 45, that amendment applied

---

[5] Pursuant to the terms of the contract Serralles paid these invoices monthly, and there is no reason to doubt their substantial accuracy.

to the transaction.[6] The tank from which delivery was taken was some two miles away from defendant's mill proper. Defendant owned and controlled it and in the normal course of business used it as a delivery point for large quantities of molasses. The principal reason for restricting the application of a maximum price regulation to deliveries from a particular place is to allow sellers to charge more when deliveries are expensive and add significantly to the cost of production. The costs of pumping the molasses from mill to tank were facts within the knowledge of defendant and largely inaccessible to plaintiff. Since defendant presented no evidence in the district court on the amount of these costs, it may be inferred that they were not very great. If the tank were adjacent to, but not physically connected with, the mill, deliveries from the tank would certainly be considered deliveries from the mill within the meaning of Amendment 45. Cf. Pellerin v. International Cotton Mills, 1 Cir., 248 F. 242; Casey v. Barber Asphalt Paving Co., 9 Cir., 202 F. 1. In the absence of significant cost figures we incline to believe that a two-mile distance between mill and tank would not alone alter this result. In ruling that Amendment 32 applied to part of this transaction, the district court necessarily found as a fact that the deliveries were made at the mill, and we cannot say this finding is clearly erroneous.

But we need not limit ourselves to a holding that delivery here was from defendant's mill, in view of the extension of coverage of the regulation by Amendment 45 to deliveries also from the "mill tank." The purpose of the addition is made quite clear, for the amendment, as quoted above, continues: "This is a gross price to which may be added no additional charges for warehousing, handling, transportation from mill to mill tank, or between mills of the same company, or for any other service or incidents of sale except that a purchaser from a mill may on resale add the actual transportation charges incurred by him in transporting the molasses from the mill or mill tank to the point at which the buyer receives delivery." Whether this was intended merely to clarify or to enlarge the previous coverage of Amendment 32 is immaterial here. Despite defendant's attempted classification of the tank here involved as a storage tank, rather than a mill tank, we think it tolerably clear that the addition was intended to hit and to prohibit additional charges in cases such as this.

Since in our view Amendment 45 controls, we do not consider the Administrator's alternative position that the sale and delivery violated the General Maximum Price Regulation based on prices charged during a base period. Were it necessary to reach the issue, we should feel it necessary to determine it, since we do not accept defendant's contention that this theory was not within the pleadings and case as finally developed at the trial or that it constituted a change in the "cause of action" allowing a defense based on a statute of limitations. Rule 15(b, c), Federal Rules Civil Procedure, 28 U.S.C.A. following section 723c. The act of transgression by the defendant remains the same, whether it violates or is claimed to violate one regulation or another; and a mere shift in legal theory is not the assignment of a new "cause." Tiller v. Atlantic Coast Line R. Co., 323 U.S. 574, 580, 65 S.Ct. 421, 89 L.Ed. 465; Reeves v. Beardall, 316 U.S. 283, 285, 62 S.Ct. 1095, 86 L.Ed. 1478; cases collected Clark, Code Pleading, 2d Ed. 1947, 141, 147, 148, 731, 732. But the issue on the General Maximum Price Regulation turned on an extensive dispute, involving both facts and law, as to defendant's sales price for the base period, which need not be rehearsed here. The defendant has a further defense that its colonos, or sugar planters, entitled to share in the proceeds of the crop, were indispensable parties. But this is clearly not so. The statute and regulation are aimed against the seller; whether he may be

---

6 As originally drawn, the complaint alleged violation of Maximum Price Reg. 183. Since the district court concluded that delivery took place in part while Amendment 32 to that regulation was in effect, it applied that amendment. In view of our conclusion that delivery took place after Amendment 45 superseded Amendment 32, Amendment 32 need not be further considered.

answerable to others for some of the proceeds does not make the latter joint owners of the property or partners in his violation of law. See Rules 19, 20, Federal Rules Civil Procedure; Greenleaf v. Safeway Trails, 2 Cir., 140 F.2d 889, certiorari denied 322 U.S. 736, 64 S.Ct. 1048, 88 L.Ed. 1569; Isaacks v. Jeffers, 10 Cir., 144 F.2d 26, 29, certiorari denied Jeffers v. Isaacks, 323 U.S. 781, 65 S.Ct. 270, 89 L.Ed. 624; Note, 56 Yale L.J. 1088.

■ Since Amendment 45 applies to this transaction, the case must be remanded for the entry of a judgment based on the overcharge on the total amount of molasses sold for more than the ceiling price. Plaintiff further urges that the district court abused its discretion in disallowing multiple damages. The Emergency Price Control Act, § 205(e), 50 U.S.C.A.Appendix, § 925(e), as amended by the Chandler amendment of 1944, grants the district court discretion to award up to $50 or triple the amounts of the overcharges, whichever is greater, as damages, unless the violator proves that his overcharges were neither willful nor the result of his failure to take precautions to prevent them. If the violator proves both these points, the court may not award more than $25 or the amount of the overcharge, whichever is greater. Bowles v. Krodel, 7 Cir., 149 F.2d 398, 400; Bowles v. Goebel, 8 Cir., 151 F.2d 671; Porter v. Gray, 9 Cir., 158 F. 442; Porter v. Ramsey, 10 Cir., 159 F.2d 180. In this case the district court found that the overcharge was not willful. It did not find that the overcharge was not the result of defendant's failure to take proper precautions, although it did find that before the execution of the contract in March, 1944, defendant inquired about the ceiling price for molasses and was informed by the San Juan, P. R., Office of Price Administration that it was "the highest price at which defendants had sold blackstrap molasses during the base period April 10, 1942 to May 10, 1942."

Apparently the district court considered that these findings did not deprive it of its discretion to award greater damages than it actually did, for in ruling on damages it stated: "If the Court has discretion, as I think it has, this is a proper case for its exercise." 67 F.Supp. 107, 110. In making its decision the court properly noted that the contract provided for price adjustment if a government agency should determine that the price was over the ceiling and that defendant inquired concerning the ceiling price before entering into the contract. But it appears to have excluded, as irrelevant, evidence of defendant's direct knowledge of Amendment 32, as well as evidence of the publication of the amendment in sources available to defendant. This evidence would have been helpful in evaluating defendant's conduct as to willfulness and the taking of proper precautions, and hence would have aided it in the exercise of its discretion, unless, as defendant's brief seems to intimate, defendant admits awareness of the provisions of Amendment 32.

■ Moreover, the court in our view misinterpreted the term "purchaser of the same class" appearing in the General Maximum Price Regulation. This was important, since, when the contract was executed, that regulation was in effect, and defendant's pricing in the contract, as measured against it, would be an important factor to be considered in exercising judicial discretion. There was uncontradicted evidence that Mr. Mandry, defendant's acting manager, who signed the contract on its behalf, knew that the General Maximum Price Regulation set the maximum price as that charged during the base period to each class of purchaser.[7] During the base period defendant had made deliveries under a contract for the sale of 1,800,000 gallons of molasses at 13¢ per gallon. During that period defendant also sold and delivered 7 lots of molasses ranging from 50 to 7,300 gallons of molasses to 7 individual purchasers at 17¢ per gallon. The court found that the quantity purchaser bought for resale, the others for their own consumption. On the findings the court

---

[7] This was the explicit information given by the San Juan, P. R., Office of Price Administration by letter of Feb. 29, 1944, to Mr. Mandry in response to the latter's inquiry of Feb. 25. In its finding as to this letter, the district court omitted the phrase "to each class of purchaser."

determined that the class of the purchaser should be decided by "the use of the commodity." This classification placed Serralles, who bought the molasses for use in its distillery, in the same class as the small purchasers in the base period. Sec. 1499.-20(k), 7 F.R. 3156, of the General Maximum Price Regulation defines the words "purchaser of the same class" as referring to "the practice adopted by the seller in setting different prices for commodities or services for sales to different purchasers or kinds of purchasers." The criterion is therefore defendant's business practice. As to this the purchasers' use can conceivably be an evidential, but not an ultimate, factor. The evidence here introduced would suggest that defendant did allow quantity discounts; but we do not decide that point, since evaluation of the evidence is for the district court. We think therefore that the case should also be remanded to allow the district court to reconsider its award of damages in accordance with the views here expressed. In so doing the court may find it desirable to receive more evidence and to consider not merely a discretionary award, but also the effect of the proof on the two points emphasized in the Chandler amendment stated above.

 Defendant argues that the entire action is barred under either § 205(d) of the Act or a 1946 amendment to § 205 (e). But § 205(d) does not excuse defendant, for the act of delivery was, as we have seen, not performed in compliance with a regulation, but in violation of one. Bowles v. Franceschini, 1 Cir., 145 F.2d 510, 513; Star Steel Supply Co. v. Bowles, 6 Cir., 159 F.2d 812, 817. To accept this excuse would be to rule that a seller's ignorance of the applicable regulation would place his unlawful overcharge beyond the legal reach of a buyer seeking to recover it. Nor does the 1946 amendment to § 205(e) bar the suit, because Besosa, on whose information defendant claimed reliance, was not one of the officials specified in that amendment as having power to prejudice the Administrator's right of suit.

On the plaintiff's appeal, the judgment will be reversed and the action remanded to the district court for the limited purposes stated in the opinion. Defendant's appeal is not sustained.

The judgment of the District Court is reversed, and the case is remanded to that court for further proceedings in conformity with this opinion.